## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACIE BYERS and DEBORAH A. SELTZER, each individually and on behalf of all others similarly situated, Plaintiffs, <br><br> v. <br><br> INTUIT, INC. and H&R BLOCK DIGITAL TAX SOLUTIONS, LLC and FREE FILE ALLIANCE, LLC, each individually and on behalf of all others similarly situated, and the INTERNAL REVENUE SERVICE, Defendants. | CIVIL ACTION NO. 07-4753 |

### MEMORANDUM  AND  ORDER

O'Neill, J.[1]                                                    May 28, 2008

Before me are the motions of Defendants Intuit, Inc., the Free File

Alliance, LLC, and H&R Block Digital Tax Solutions, LLC to dismiss Plaintiffs'

First Amended Complaint (Documents No. 32, 33, and 34 respectively), Plaintiffs'

responses thereto (Documents No. 45 and 46), and Defendants' reply briefs

(Documents No. 47, 48, and 49).  For the following reasons, all three motions will

be granted, and Plaintiffs' First Amended Complaint will dismissed as to all

---

[1] By Order dated April 15, 2008, this action was reassigned from the calendar of the Honorable Marvin Katz to my calendar.  See Document No. 43.

Defendants except the Internal Revenue Service.

## I. Background

### A. Overview

Plaintiffs in this action are Stacie Byers and Deborah A. Seltzer, both of whom are citizens of Pennsylvania.  First Amended Complaint ("FAC") ¶¶ 6–7. Defendants in this action are Intuit, Inc. ("Intuit"),[2] H&R Block Digital Tax Solutions, LLC ("Block"),[3] the Free File Alliance, LLC ("FFA"),[4] and the Internal Revenue Service ("IRS").  Id. ¶¶ 8–10, 12.  Like Plaintiffs, I will refer to Defendants Intuit, Block, and FFA as the "Corporate Defendants."  Id. ¶ 10. According to Plaintiffs, Defendants Intuit and Block have been members of Defendant FFA at all times relevant to this lawsuit.  Id. ¶ 11.

Plaintiffs assert two claims on behalf of themselves and the proposed class of taxpayers and tax preparers.  First, Plaintiffs claim that all the named Defendants and the members of the defendant class have violated the Independent

---

[2] Defendant Intuit is a Delaware corporation with its principal place of business in California.  See FAC ¶ 8.

[3] Defendant Block is a Delaware limited liability corporation with its principal place of business in Missouri.  See FAC ¶ 9.

[4] Defendant FFA is a District of Columbia limited liability corporation with "offices" in Virginia.  See FAC ¶ 10.  The First Amended Complaint calls Defendant FFA a "Cartel," see FAC ¶ 1; I will refer to it as "Defendant FFA."

Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, by charging them and the proposed class "illegal fees to electronically file ('e-file') their federal tax and information returns with the IRS through the IRS' electronic tax and information return filing program, known as 'IRS *e-file*.'"[5]  FAC ¶¶ 1–2, 22, 39.  Second, Plaintiffs claim that all the named Defendants except the IRS (i.e., the Corporate Defendants)[6] and the defendant class have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by "illegally agree[ing] among themselves that no member of the [FFA] would individually offer free e-filing services to more than fifty percent of taxpayers, and that collectively they would not offer free e-filing services to more than seventy percent of taxpayers."  Id. ¶¶ 3, 23, 40.  Plaintiffs further allege that they "purchased and used" Defendants Block and Intuit's "tax return preparation software and 'e-filing' services in the Commonwealth of Pennsylvania to electronically prepare and e-file [their] 2006 income tax return[s] with the IRS

---

[5] In their response, Plaintiffs note that they "are *not* seeking to imply a private right of action under the IOAA."  Plaintiffs' Response to Intuit's Motion, at 17.  Instead, Plaintiffs claim to be "pursuing an equitable remedy under the provisions of the Administrative Procedures Act [(APA)]."  Id.  I therefore will refer to Plaintiffs' claim in Count I as their IOAA/APA claim.

[6] The IRS is not named as a defendant in Count II presumably because neither the United States nor any agency "of the executive branch of the Government of the United States" is a "person" subject to potential liability under the Sherman Act.  See United States Postal Service v. Flamingo Indus., Ltd., 540 U.S. 736, 745–46 (2004).

through the IRS's e-file service."[7]  Id. ¶¶ 14–15.

The significance of this lawsuit is underscored by Plaintiffs' allegations that "hundreds of millions of tax returns have been filed electronically with the IRS through the Corporate Defendants," id. ¶ 20, and that "the Corporate Defendants have illegally charged and/or overcharged Plaintiffs, taxpayers, and tax preparers hundreds of millions, if not billions of dollars to file such returns." Id.

## B.  The Creation of the IRS's Free File Program

In the Internal Revenue Restructuring and Reform Act of 1998 ("RRA"), Congress set a policy goal of encouraging the electronic filing of federal tax and information returns with Defendant IRS.  Specifically, § 2001(a) of the RRA declared that:

(a) In general.–It is the policy of Congress that –

(1) paperless filing should be the preferred and most convenient means of filing Federal tax and information returns;
(2) it should be the goal of the Internal Revenue Service to have at least 80 percent of all such returns filed electronically by the year 2007; and
(3) the Internal Revenue Service should cooperate with and encourage the private sector by encouraging competition to

---

[7] According to the First Amended Complaint, Plaintiff Byers "purchased and used" the software and e-filing services of Defendant Block, id. ¶ 14, whereas Plaintiff Seltzer "purchased and used" the software and e-filing services of Defendant Intuit.  Id. ¶ 15.

4

increase electronic filing of such returns.

Pub. L. No. 105-206, Title II, 112 Stat. 723 (1998); accord 26 U.S.C. § 6011(f)

(2008).  Motivated in part by this policy, Defendant IRS in August 2002 published

notice in the Federal Register of its intent to "enter into an agreement (the

Agreement) with a consortium of companies in the electronic tax preparation and

filing industry (the Consortium) who together desire to work together to offer free,

online tax return preparation and filing services to taxpayers (Free Services)."[8]  67

Fed. Reg. 51621 (Aug. 8, 2002).  After comments were received, Defendant IRS,

in accordance with this notice and with the requirements of the Administrative

---

[8] Achieving the policy goals set forth in § 2001(a) of the RRA was only one of the purposes of this agreement.  According to the proposed terms of the agreement, it was designed to meet the following five objectives:

1.   Assuring access to a free and secure electronic preparation and filing option for additional taxpayers, building upon free electronic tax preparation and filing provided in the commercial market today;

2.   Making tax return preparation and filing easier and reducing the burden on individual taxpayers;

3.   *Supporting the IRS's statutory goals of increased e-filing, pursuant to the IRS Restructuring and Reform Act of 1998, which encouraged the IRS to set a goal of having 80% of Federal tax and information returns filed electronically by the year 2007;*

4.   Providing greater service and access to taxpayers; and

5.   Implementing one of the proposals in the President's FY '03 budget, specifically to encourage further growth in electronic filing by providing taxpayers the option to file their tax return on-line without charge, using cooperation with, and encouraging competition within, the private sector to increase e-filing.

FAC, Exhibit A, art. I (emphasis added).

Procedures Act ("APA"), entered into an agreement on October 30, 2002 with the "Consortium" – i.e., Defendant FFA – which is described in the agreement as "a non-profit corporation (under the provisions of 26 U.S.C. § 501(c)(3)) formed under the auspices of, and affiliated with, the Council for Electronic Revenue Communication Advancement."[9]  FAC, Exhibit A, at 1 (2002 Free On-Line Electronic Tax Filing Agreement); see also 67 Fed. Reg. 67247 (Nov. 4, 2002).

The 2002 Agreement between Defendants FFA and the IRS lasted for three years.  See FAC, Exhibit A, art. VII.A ("This Agreement has an initial term of three years from its effective date with automatic options to renew for successive two year periods."); see also 67 Fed. Reg. 67247, 67250.  On October 30, 2005, Defendants FFA and the IRS renewed this agreement for an additional four years, subject to certain changes and additional conditions.[10]  See FAC,

---

[9] "Membership in [the] Free File Alliance is open to all companies that can satisfy the basic eligibility requirements."  67 Fed. Reg. 67247, 67248; see also FAC, Exhibit A, art. III.B.

[10] Section IV of the 2005 Agreement provides that the "IRS and the Executive Director and Alliance attorney are developing a memorandum of understanding (MOU) that would provide structure for the roles and responsibilities for both the IRS and the FFA leadership."  FAC, Exhibit B, art. IV.A.  On December 20, 2005,  pursuant to the above-quoted language, Defendants FFA and the IRS signed a Memorandum of Understanding ("MOU") which formalized certain standards of practice, as well as "the process whereby a Member [of the FFA] may be denied permission to list its company on the IRS website and/or a Member's listing may be removed from the IRS website."  Defendant FFA's Motion, Exhibit 4, at 1 (Preamble).  On January 12, 2007, Defendant FFA and the IRS signed another, similar MOU that superseded their December 20, 2005 MOU.  See Defendant FFA's Motion, Exhibit 5.  The term of the superseding 2007 MOU is the same as the term of the 2005 Agreement (i.e., 4 years), and the 2007 MOU "may be terminated consistent with that agreement."  Defendant FFA's Motion,

Exhibit B (2005 Free On-Line Electronic Tax Filing Agreement Amendment).

## C.  What the Free File Alliance Does

Although the agreements governing the relationship between Defendants FFA and the IRS are quite detailed, they have been summarized succinctly as follows:[11]

> To accomplish the above objectives, the IRS and the [FFA] (together, "the Parties") will work together to offer free, on-line tax return preparation and filing services to taxpayers ("Free Services").  The [FFA] will offer Free Services to taxpayers.  The IRS will provide taxpayers with links to the Free Services offered by the [FFA] Participants through a web page . . ., which will be hosted at irs.gov accessible through firstgov.gov.  During the term of this Agreement, the IRS will not compete with the FFA in providing free, online tax return preparation and filing services to taxpayers.
>
> This Agreement is the best method for meeting the above stated

_____

Exhibit 5, art. VI.  I have not found, nor have the parties mentioned, any differences between the 2005 and 2007 MOUs that are relevant to this action.

[11] A somewhat simpler explanation of the Free File Program may be found on the IRS's website:

> Free File is a free federal income tax preparation and electronic filing program for eligible taxpayers, developed through a partnership between the Internal Revenue Service (IRS) and the Free File Alliance, LLC, a group of private sector tax software companies.  You may access free commercial online tax preparation and electronic filing services through the IRS website.  Eligible taxpayers may prepare and file their federal income tax returns using commercial online software provided by the Free File Alliance companies – not the IRS.  Since Free File's debut in 2003, more than 19.2 million returns have been filed through the program saving taxpayers millions of dollars.

Defendant FFA's Motion to Dismiss, Exhibit 3 ("What Is Free File?").

objectives because it will promote higher quality Free Services by utilizing the existing expertise of the private sector, maximize consumer choice, promote competition for such Free Services, and thereby meet the objectives in the least costly manner.

FAC, Exhibit A, art. II.

Under the 2002 Agreement, Defendant FFA committed to offering free online federal tax return preparation and filing services to at least 60% of taxpayers during the primary tax filing season.  Id. at arts. III.A and IV.C.  Under the 2005 Agreement, that percentage was increased to and capped at 70%, and Defendants FFA and the IRS further "agree[d] that to serve the greater good and to ensure the long-term stability of the Alliance, the scope of this program is focused on covering the taxpayers least able to afford e-filing their returns on their own."[12] FAC, Exhibit B, arts. I.B and I.C.  Defendants FFA and the IRS therefore agreed that the "IRS will utilize the then current Adjusted Gross Income (AGI) number which equates to 70% of the taxpayers to manage the program."  Id. at art. I.E.  As of December 19, 2007, this AGI number was $54,000.  See Defendant FFA's Motion, Exhibit 3 ("Free File is only available to taxpayers who have a 2007 Adjusted Gross Income (AGI) of **$54,000 or less**. . . .  If your Adjusted Gross

_____

[12] The 2005 and 2007 MOUs signed by Defendants FFA and the IRS express a similar goal – i.e., "increas[ing] electronic filing of tax returns, which includes extending the benefits of on-line federal tax preparation and electronic filing to economically disadvantaged and underserved populations at no cost to the individual or the government."  Defendant FFA's Motion, Exhibit 4, art. II; see also id. Exhibit 5, art. II.

Income (AGI) exceeds $54,000, . . . you may continue completing your return, but you will be charged a fee for preparation.") (emphasis in original).

Interestingly, the 2002 Agreement required each FFA member to offer free online federal tax return preparation and filing services to 10% of taxpayers, but did not set an upper limit on the percentage of taxpayers who could be offered free services. <u>See</u> FAC, Exhibit A, art. III.B.2. The 2005 Agreement also provides that "[e]ach Alliance member must provide a minimum of 10% coverage," but adds that "[n]o individual Alliance member offer can cover more than 50 percent of total taxpayers . . ., and this taxpayer population must be within the total aggregate coverage scope of 70%." FAC, Exhibit B, arts. I.A and I.D. The upshot is that under the 2005 Agreement no FFA member is permitted to offer free services to more than 71.4% (<u>i.e.</u>, five-sevenths) of the taxpayers whose AGI is less than $54,000.

### D. Plaintiff's Claims

#### 1. General Allegations

According to Plaintiffs, "taxpayers and tax preparers who electronically prepare and file federal tax and information returns through the IRS' *e-file* program are required to file those returns through private companies, including members of the [FFA], instead of directly with the IRS." FAC ¶ 16. In

9

addition, "the IRS provides substantial incentives to taxpayers who file their

returns electronically, including quicker processing and more rapid tax refunds,

and threatens those who do not with a greater likelihood of an audit."  Id. ¶ 17.

Plaintiffs characterize the 2002 and 2005 Agreements between

Defendants FFA and the IRS as follows:

> Pursuant to the [FFA's] agreement with the IRS, the Corporate
> Defendants and members of the [FFA] agreed to develop and
> maintain the IRS's electronic tax forms and filing system (IRS *e-file*)
> for the IRS under the IRS's direct guidance, supervision and control.
> In return, the IRS agreed not to independently develop and maintain
> its own tax return e-filing system, which it had otherwise intended to
> do, and which all taxpayers and tax preparers could have used to
> electronically prepare and/or file their federal tax and information
> returns with the IRS at little or no cost.  All of this was done under
> the guise of providing free e-filing to certain low-income taxpayers.
> However, the practical effect and true purpose of the agreement was
> to deny free e-filing to all taxpayers, and to permit the Corporate
> Defendants and members of the [FFA] to charge Plaintiffs and
> members of the proposed class exorbitant and illegal fees for e-filing.
> The IRS, the Corporate Defendants, and all members of the [FFA]
> benefitted from this arrangement to the great expense and detriment
> of Plaintiffs and the proposed class.

Id. ¶ 18.  In sum, Plaintiffs allege that "[t]he Agreements wrongfully 'privatized'

IRS *e-file* and the IRS's quintessential government task of developing, receiving,

collecting and processing tax returns by allowing [FFA] members to reap profits

by charging taxpayers and tax preparers substantial and legally unauthorized fees

to electronically file returns with the IRS."  Id. ¶ 17.

Plaintiffs further allege that "when renewing the 2002 Agreement with the IRS in 2005, the members of the [FFA] illegally agreed among themselves that no member of the [FFA] would individually offer free e-filing services to more than fifty percent of taxpayers, and that the members of the [FFA] collectively would not offer free e-filing services to more than seventy percent of taxpayers." Id. ¶ 19.  According to Plaintiffs, "[t]hat illegal agreement among competitors to restrict output had the effect of raising prices in the market for tax preparation software, including internet-based software, and e-filing services," and directly caused "Plaintiffs and the members of the proposed class [to pay] supracompetitive prices for the tax preparation software and e-filing services that they purchased." Id.

### 2.  Count I – Claim Under the APA Against All Defendants and the Defendant Class for Violation of the IOAA, 31 U.S.C. § 9701[13]

---

[13] The IOAA, 31 U.S.C. § 9701, reads, in its entirety, as follows:

(a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.

(b) The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing of value provided by the agency.  Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable.  Each charge shall be –
    (1) fair; and

To lay the foundation for their claim for a refund of fees unlawfully charged by Defendants, Plaintiffs allege three important facts: (1) "[t]he IRS is statutorily required to collect tax and information returns from taxpayers, and taxpayers are required to file such returns with the IRS, in accordance with the rules and regulations promulgated by the IRS,"[14] id. ¶ 56; (2) "[t]he option to file federal tax and information returns electronically with the IRS is a service or thing of value within the meaning of 31 U.S.C. § 9701," id. ¶ 57; and (3) "[a]t all material times hereto, the Corporate Defendants acted on behalf of and as agents of the IRS." Id. ¶ 54.

The heart of Plaintiffs' IOAA/APA claim is their allegation that

---

      (2) based on –
          (A) the costs to the Government;
          (B) the value of the service or thing to the recipient;
          (C) public policy or interest served; and
          (D) other relevant facts.

    (c) This section does not affect a law of the United States –
        (1) prohibiting the determination and collection of charges and the disposition of those charges; and
        (2) prescribing bases for determining charges, but a charge may be redetermined under this section consistent with the prescribed bases.

31 U.S.C. § 9701 (2008).

[14] According to Plaintiffs, these IRS "rules and regulations" "*require*[] certain taxpayers to e-file their tax and information returns through IRS *e-file*, and provide[] substantial incentives for others to do so." Id. ¶ 56.

Defendants and the defendant class[15] failed to follow the rule that, "[i]n setting the
fees for filing tax and information returns with the IRS, the IRS and/or the
Corporate Defendants, as agents of the IRS, were required under the [IOAA] to
charge only such fees that are '(1) fair; and (2) based on – (A) the costs to the
government; (B) the value of the service or thing to the recipient; (C) public policy
or interest served; and (D) other relevant facts.'" Id. ¶ 58 (quoting 31 U.S.C. §
9701(b)).  Instead, "the fees charged were based solely on the profit that the
Corporate Defendants believed they could extract from taxpayers and tax
preparers." Id. ¶ 59.  Plaintiffs therefore claim that they and the proposed plaintiff
class[16] "are entitled to . . . injunctive relief prohibiting the IRS and/or the
Corporate Defendants from charging such fees in the future" as well as "the
imposition of a constructive trust [on] and a refund of such fees."[17] Id. ¶ 65; see

---

[15] "The defendant class with regard to Plaintiffs' claim arising out of 31 U.S.C. § 9701
includes the IRS and all members of the [FFA] which charged Plaintiffs or members of the
proposed plaintiff class fees to electronically prepare and/or file federal tax or information
returns with the IRS." Id. ¶ 39.

[16] "The proposed plaintiff class with respect to Plaintiffs' claims arising out of 31 U.S.C.
§ 9701 includes all persons and entities that paid any Corporate Defendant and/or any member of
the [FFA] to electronically file a tax or information return with the IRS." Id. ¶ 22.

[17] Plaintiff also seeks a full and complete accounting, at Defendants' expense, of "all fees
charged Plaintiffs and the proposed class to electronically file tax and information returns with
the IRS," as well as "all fees charged Plaintiffs and the proposed class for tax return preparation
software, including internet-based services, since the Free File Alliance, LLC entered into its
2002 Agreement with the IRS."  FAC at Prayer for Relief (b), (c).

13

also id. ¶ 55.

### 3. Count II – Claim Against the Corporate Defendants and the Defendant Class for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1[18]

In support of their claim against the Corporate Defendants and the

defendant class (but not against Defendant IRS) under Section 1 of the Sherman

Act, 15 U.S.C. § 1, Plaintiffs allege the following:  (1) "[t]he relevant

product/service market is the market for electronic tax preparation software,

including internet-based software, and e-filing services," id. ¶ 67; (2) "[t]he

relevant geographic market includes the United States and its territories," id. ¶ 68;

(3) "[a]ll of the Defendant members of the Cartel [i.e., the FFA], with the

exception of the Free File Alliance, are direct horizontal competitors, or potential

horizontal competitors, in the relevant product/service and geographic markets,"[19]

id. ¶ 69; and (4) "[t]he Corporate Defendants and other members of the Cartel

control the vast majority of the market, if not the entire market, for electronic tax

preparation software, including internet-based software, and e-filing services in

---

[18] Section 1 of the Sherman Act declares that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (2008).

[19] In this subsection, the court will refer to Defendant FFA as a "Cartel," because Plaintiffs allege that "[t]he Free File Alliance is a cartel of direct horizontal competitors and/or potential competitors."  Id. ¶ 69.

the United States and its territories." Id. ¶ 81.

Plaintiffs further allege that the Corporate Defendants' and the defendant class nakedly restricted output by "explicitly agree[ing] among themselves [in the 2005 Agreement] that no member of the Cartel would individually offer free e-filing services to more than fifty percent of taxpayers, and that the Cartel collectively would not offer free e-filing services to more than seventy percent of taxpayers." Id. ¶ 71.  According to Plaintiffs, "[t]he Corporate Defendants' collusion by and through the Cartel and the 2005 Agreement directly permitted the Corporate Defendants to charge Plaintiffs supracompetitive prices for their electronic tax preparation software, including internet-based software, and e-filing services, to Plaintiffs' great detriment and loss, depriving Plaintiffs and members of the proposed plaintiff class of a myriad of price and non-price discounts, including lower prices and free services." Id. ¶ 76.

Plaintiffs allege that, by entering into the 2005 Agreement, the Corporate Defendants and the defendant class[20] have unlawfully restrained trade in violation of Section 1 of the Sherman Act.  See id. ¶¶ 73, 74, 80.  Plaintiffs, on

---

[20] "The defendant class with regard to Plaintiffs' claim arising out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, includes all members of the Cartel which charged Plaintiffs or members of the proposed plaintiff class fees to electronically prepare and/or file federal tax or information returns with the IRS from October 30, 2005 to the present, as well as the Cartel itself." Id. ¶ 40.

behalf of themselves and the proposed plaintiff class,[21] seek treble damages

pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as injunctive

relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.  See id. ¶¶ 84–85.

## II.  Legal Standards

The Corporate Defendants have moved to dismiss Plaintiffs' First

Amended Complaint pursuant to FED. R. CIV. P. 12(b)(6) and 12(b)(1).  The

Corporate Defendants' argument that Plaintiffs lack constitutional and prudential

standing implicates Rule 12(b)(1); all of the Corporate Defendants' other

arguments for dismissal implicate Rule 12(b)(6).[22]

### A.  FED. R. CIV. P. 12(b)(6)

The Supreme Court has summarized as follows the legal standard

applicable to a FED. R. CIV. P. 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and
> plain statement of the claim showing that the pleader is entitled to
> relief," in order to "give the defendant fair notice of what the . . .

---

[21] "The proposed plaintiff class with respect to Plaintiffs' claims arising out of 15 U.S.C. § 1 includes all persons and entities that paid any Corporate Defendant and/or any member of the Cartel for electronic tax preparation software, including internet-based software, and/or to electronically file a tax or information return with the IRS since October 30, 2005." Id. ¶ 23.

[22] There is ample authority for deciding a motion to dismiss for lack of standing under Rule 12(b)(1).  See Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 187–88 (3d Cir. 2006) (reviewing the district court's dismissal for lack of standing under Rule 12(b)(1)); 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3531.15 n.9 (2d ed. 1984).

claim is and the grounds upon which it rests."  While a complaint
attacked by a Rule 12(b)(6) motion to dismiss does not need detailed
factual allegations, a plaintiff's obligation to provide the "grounds" of
his "entitle[ment] to relief" requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of action will not
do.  *Factual allegations must be enough to raise a right to relief
above the speculative level, on the assumption that all the allegations
in the complaint are true (even if doubtful in fact).*

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964–65 (2007) (quoting Conley

v. Gibson, 355 U.S. 41, 47 (1957)) (emphasis added) (internal citations and

footnote omitted); accord Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007);

Phillips v. County of Allegheny, 515 F.3d 224, 231–32 (3d Cir. 2008).[23, 24]  The

Court of Appeals for the Third Circuit recently reexamined the Rule 12(b)(6)

standard in light of Twombly and offered the following helpful observations:

---

[23] In the footnote in the above-quoted passage, the Twombly Court added that "[w]hile,
for most types of cases, the Federal Rules eliminated the cumbersome requirement that a
claimant 'set out *in detail* the facts upon which he bases his claim,' Rule 8(a)(2) still requires a
'showing,' rather than a blanket assertion, of entitlement to relief."  127 S.Ct. at 1965 n.3
(quoting Conley, 355 U.S. at 47) (emphasis in original).  "Without some factual allegation in the
complaint, it is hard to see how a claimant could satisfy the requirement of providing not only
'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  Id.; see also
Phillips, 515 F.3d at 232 ("We caution that without some factual allegation in the complaint, a
claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the
'grounds' on which the claim rests.").

[24] "In [Twombly], the Supreme Court rejected language that long had formed part of the
Rule 12(b)(6) standard, namely the statement in Conley v. Gibson, 355 U.S. 41 (1957), that a
complaint may not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no
set of facts in support of his claim which would entitle him to relief.'"  Phillips, 515 F.3d at 230
(quoting Conley, 355 U.S. at 45–46); see also Twombly, 127 S. Ct. at 1969 ("*This phrase is best
forgotten as an incomplete, negative gloss on an accepted pleading standard*; once a claim has
been stated adequately, it may be supported by showing any set of facts consistent with the
allegations in the complaint.") (emphasis added).

The Supreme Court's <u>Twombly</u> formulation of the pleading standard
can be summed up thus:  "stating . . . a claim requires a complaint
with enough factual matter (taken as true) to suggest" the required
element.  [<u>Twombly</u>, 127 S. Ct. at 1965.]   This "does not impose a
probability requirement at the pleading stage," but instead "simply
calls for enough facts to raise a reasonable expectation that discovery
will reveal evidence of" the necessary element.  <u>Id.</u>

<u>Phillips</u>, 515 F.3d at 234.

In the wake of <u>Twombly</u>, the Court of Appeals has stated that "[i]t

remains an acceptable statement of the [Rule 12(b)(6)] standard, for example, that

courts 'accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to relief.'"  <u>Phillips</u>, 515

F.3d at 233 (quoting <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d

Cir. 2002)).  In so doing, the court usually looks "only to the facts alleged in the

complaint and its attachments without reference to other parts of the record," <u>see</u>

<u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994),

but it also may consider "matters of public record . . . and undisputedly authentic

documents attached to a motion to dismiss."  <u>Delaware Nation v. Pennsylvania</u>,

446 F.3d 410, 413 n.2 (3d Cir. 2006).

## B.  FED. R. CIV. P. 12(b)(1)

The Court of Appeals has summarized the law governing Rule

12(b)(1) motions to dismiss as follows:

> Challenges to subject matter jurisdiction under Rule 12(b)(1) may be
> "facial" or "factual." Facial attacks . . . contest the sufficiency of the
> pleadings, and the trial court must accept the complaint's allegations
> as true. In contrast, a trial court considering a factual attack accords
> plaintiff's allegations no presumption of truth. In a factual attack, the
> court must weigh the evidence relating to jurisdiction, with discretion
> to allow affidavits, documents, and even limited evidentiary hearings.

Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002)

(internal citations omitted); see also NE Hub Partners, L.P. v. CNG Transmission

Corp., 239 F.3d 333, 341 (3d Cir. 2001). In Gould Elecs., Inc. v. United States,

220 F.3d 169, 176 (3d Cir. 2000), the Court of Appeals further explained how

courts should handle facial attacks under Rule 12(b)(1), writing that "[i]n

reviewing a facial attack, the court must only consider the allegations of the

complaint and documents referenced therein and attached thereto, in the light most

favorable to the plaintiff." In the context of a Rule 12(b)(1) motion to dismiss,

"[t]he plaintiff has the burden of persuasion to convince the court it has

jurisdiction." Id. at 178.

District courts have discretion to treat Rule 12(b)(1) motions as either

facial or factual challenges to their subject matter jurisdiction. See Gibbs v. Buck,

307 U.S. 66, 71–72 (1939) ("As there is no statutory direction for procedure upon

an issue of jurisdiction, the mode of its determination is left to the trial court.");

5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

PROCEDURE § 1350 n.47 (3d ed. 2004); see also Gould Elecs., Inc., 220 F.3d at

176 ("A Rule 12(b)(1) motion may be treated as either a facial or factual challenge

to the court's subject matter jurisdiction.").  No party has taken a position on

whether I should consider the Corporate Defendants' 12(b)(1) motions a facial or

factual challenge.  Since this action was filed quite recently, I find it more

appropriate to consider the Corporate Defendants' motions a facial challenge to

this court's jurisdiction.[25]

### III.  Discussion

The Corporate Defendants first argue that this action should be

dismissed pursuant to Rule 12(b)(1), because Plaintiffs lack constitutional and

prudential standing.[26]  As explained below, I disagree.

With respect to Count I – i.e., Plaintiffs' claim under the IOAA/APA

– the Corporate Defendants argue that this claim should be dismissed pursuant to

Rule 12(b)(6) on three grounds:  (1) because the IOAA does not apply to them in

---

[25] If necessary, the Corporate Defendants may challenge this court's jurisdiction factually at a later date, when the record is more fully developed.

[26] See Defendant FFA's Memorandum of Law, § IV; Defendant Block's Memorandum of Law, § III.B.1.

this case;[27] (2) because there is no express or implied private right of action under

the IOAA;[28] and (3) because Plaintiffs' claim fails factually, since the Corporate

Defendants do not charge fees for the services they provide as part of the Free File

Program.[29]   In their responses, Plaintiffs contest grounds (1) and (3) but not

ground (2), since they say that Count I is a claim under the Administrative

Procedures Act, 5 U.S.C. § 702.  I will grant the Corporate Defendants' motions to

dismiss Count I as against them, because I agree that the IOAA does not apply to

them in this case.  In the alternative, I will dismiss Count I on the grounds that

there is no express or implied private right of action under the IOAA, and that

Plaintiffs cannot bring an APA claim against the Corporate Defendants, who are

not "agencies" within the meaning of the APA.  (I need not address the argument

that Plaintiffs' IOAA/APA claim fails factually.)  Count I therefore will be

dismissed without leave to amend, except to the extent that Plaintiffs have asserted

an APA claim against Defendant IRS.[30]

---

[27] See Defendant Intuit's Memorandum of Law, § II; Defendant FFA's Memorandum of Law, § II.A; Defendant Block's Memorandum of Law, § III.B.3.

[28] See Defendant Intuit's Memorandum of Law, § III; Defendant FFA's Memorandum of Law, § II.B; Defendant Block's Memorandum of Law, § III.B.2.

[29] See Defendant FFA's Memorandum of Law, § II.C; Defendant Block's Memorandum of Law, § III.B.1.

[30] Defendant IRS has filed an answer, see Document No. 45, and by letter has informed me that it plans to file a motion for judgment on the pleadings and (in the alternative) for

With respect to Count II – i.e., Plaintiffs' claim under Section 1 of the Sherman Act – the Corporate Defendants argue that this claim should be dismissed pursuant to Rule 12(b)(6) for five reasons:  (1) because they are entitled to implied antitrust immunity;[31] (2) because they are shielded from liability under the Noerr-Pennington doctrine;[32] (3) because Plaintiffs lack antitrust standing;[33] (4) because "Plaintiffs have not adequately alleged an agreement to limit free services";[34] and (5) because "Plaintiffs have failed to plead any restraint on trade in a relevant market."[35]  As explained below, I reject arguments (3), (4), and (5), but I agree that Count II should be dismissed on the ground that the Corporate Defendants are entitled to implied antitrust immunity.  As for the Corporate Defendants' assertion of Noerr-Pennington immunity, I will defer ruling upon it until it is raised in a motion for summary judgment because it requires consideration of non-public matters outside the pleadings.  I therefore will dismiss Count II with leave to

summary judgment.

[31] See Defendant Intuit's Memorandum of Law, § IV; Defendant FFA's Memorandum of Law, § III.B; Defendant Block's Memorandum of Law, § III.C.1.

[32] See Defendant Intuit's Memorandum of Law, § V; Defendant FFA's Memorandum of Law, § III.A; Defendant Block's Memorandum of Law, § III.C.2.

[33] See Defendant FFA's Memorandum of Law, § IV.A.

[34] See Defendant FFA's Memorandum of Law, § III.C.

[35] See Defendant Block's Memorandum of Law, § III.C.3.

amend for the reasons stated hereinafter.

Lastly, I will reject the Corporate Defendants' assertion that the First Amended Complaint should be dismissed pursuant to Rule 12(b)(6), because it is an "untimely attempt to end-run around the APA's rulemaking and judicial review procedures."[36]

## A. Plaintiffs Have Constitutional and Prudential Standing.

## 1. In General

The Court of Appeals recently summarized the law governing standing as follows:

> Article III of the Constitution restricts the "judicial power" of the United States to the resolution of cases and controversies. See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Subsumed within this restriction is the requirement that a litigant have standing to challenge the action sought to be adjudicated in the lawsuit. Id. Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts. Id.; Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir. 1994). Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed. Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003).

Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006); see also

---

[36] Defendant FFA's Memorandum of Law, § V; see also Defendant Block's Memorandum of Law, § III.D.

<u>Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio</u>, 40 F.3d 1454, 1462 (3d Cir. 1994) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.").

## 2. Constitutional Standing

### a. Constitutional Standing Doctrine

With regard to the constitutional component of standing, the Supreme Court has declared:

> [T]he irreducible constitutional minimum of standing contains three elements. *First*, the plaintiff must have suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Second*, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

> The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. *At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.* In response to a motion for summary judgment, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other

24

evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (emphases added; internal citations, quotations, and footnote omitted).[37]

### b.  Applying Constitutional Standing Doctrine to This Case

Although the allegations in the First Amended Complaint are not particularly specific, they are sufficient to withstand the Corporate Defendants' facial challenge to my jurisdiction, and therefore are sufficient to establish Plaintiffs' constitutional standing at this stage of the action.  Plaintiff Byers alleges that she "purchased and used Defendant H&R Block's tax return preparation software and 'e-filing' services in the Commonwealth of Pennsylvania to electronically prepare and e-file her 2006 income tax return with the IRS through the IRS' e-file service."  FAC ¶ 14.  Plaintiff Seltzer did the same with Defendant Intuit's tax return preparation software and "e-filing" services.[38]  See id.

---

[37] Defendants correctly cite Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976) for the rule that "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  Id. at 40 n.20 (internal quotation omitted).

[38] I must qualify this holding in one regard.  That is, since Plaintiff Seltzer purchased and used Defendant Intuit's product (but not Defendant Block's product) and since Plaintiff Byers

¶ 15.

With respect to their IOAA/APA claim, Plaintiffs also allege that "[m]embers of [Defendant FFA], as agents of the IRS, wrongfully charged Plaintiffs and their proposed class illegal fees to electronically file ('e-file') their federal tax and information returns," id. ¶ 1, and that members of Defendant FFA, including Defendants Block and Intuit, "illegally and inequitably reaped hundreds of millions, if not billions, of dollars in revenues, all at the expense of Plaintiffs and their proposed class."  Id. ¶ 2; see also id. ¶ 20.  Plaintiffs therefore seek "a refund of such fees, as well as injunctive relief prohibiting the IRS and/or the Corporate Defendants from charging such fees in the future."[39]  Id. ¶ 65, Prayer for

---

purchased and used Defendant Block's product (but not Defendant Intuit's product), I must conclude that, with regard to Plaintiffs' IOAA/APA claims, Plaintiff Seltzer lacks constitutional standing to sue Defendant Block, and Plaintiff Byers lacks constitutional standing to sue Defendant Intuit.  See Defendant Block's Memorandum of Law, at 12 n.8.  (The same reasoning does not apply to Plaintiffs' Sherman Act claim, because the "supracompetitive" price Plaintiffs allegedly paid for Defendants Block and Intuit's products was caused, according to Plaintiffs, by the 2005 Agreement between the IRS and Defendant FFA, whose membership includes both Defendants Block and Intuit.)

[39] Defendant Block cites City of Los Angeles v. Lyons, 461 U.S. 95 (1983) for the proposition that Plaintiffs lack constitutional standing to assert their IOAA/APA claim for injunctive relief because "Plaintiffs fail to allege, and there is no basis to believe, that either one will use Block DTS tax preparation and e-filing services, or pay any fees for e-filing services, again in the future."  Memorandum of Law, at 12; see also Lyons, 461 U.S. at 105 ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers.").  I will reject this argument at this time because the First Amended Complaint contains allegations, which, when accepted as true, are sufficient to establish that Defendants are continuing to charge Plaintiffs and the proposed class unlawful fees, thereby giving Plaintiffs standing to seek injunctive relief on their IOAA/APA claim.  See FAC ¶ 65 ("Because the fees Plaintiffs and the proposed class were charged to e-file

Relief.

With respect to their Sherman Act claim, Plaintiffs allege that Defendants' "illegal horizontal agreement among direct competitors to restrict output had the effect of raising prices in the market for electronic tax preparation software, including internet-based software, and e-filing services, which caused Plaintiffs and the members of the proposed class to pay supracompetitive prices for the software, programs and e-filing services that they purchased." Id. ¶ 3. Plaintiffs therefore seek treble damages and injunctive relief pursuant to Sections 4 and 16, respectively, of the Clayton Act.  Id. ¶¶ 84–85.

Despite their lack of specificity, the above-quoted paragraphs of the First Amended Complaint show that Plaintiffs have adequately alleged that they have suffered injuries in fact (i.e., the fees that Defendants charged them and the proposed class, and the higher prices they had to pay because of Defendants' allegedly anticompetitive conduct), that Defendants caused their injuries, and that their injuries likely are redressable by a judgment in their favor in the form of damages and/or injunctive relief.  Since I must accept these allegations as true, Plaintiffs have met their burden with respect to the three prongs of the Lujan test,

their tax returns were *and are* unlawful, Plaintiffs and the proposed class are entitled to . . . injunctive relief prohibiting the IRS and/or the Corporate Defendants from charging such fees in the future.") (emphasis added).

and have established constitutional standing for both of their claims at this early stage of their action.  The Corporate Defendants' facial challenge to Plaintiffs' constitutional standing therefore fails.  See Lujan, 504 U.S. at 560–61; cf. Bennett v. Spear, 520 U.S. 154, 167–68 (1997); Nat'l Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 255–56 (1994).

I find unconvincing Defendants FFA and Block's arguments against Plaintiffs' constitutional standing.  Defendant Block argues that Plaintiff Byers lacks constitutional standing to assert her IOAA/APA claim because "[she] claims that she used [Defendant Block's] software to electronically file her return through the 'IRS e-file service,' but does not say whether she attempted to use, or was eligible for, the Free File Program."  Defendant Block's Memorandum of Law, at 12.  According to Defendant Block, "[Plaintiff Byers's] failure to make such an allegation is fatal to her standing to assert the IOAA/APA claim, because that claim is premised on Block DTS's membership and participation in the Free File Program."  Id.  I am not persuaded by this argument.  It is true that the First Amended Complaint does not allege whether Plaintiff Byers qualified for the Free File Program, but that is not the focus of the constitutional standing inquiry.  Rather, the focus of the inquiry is Plaintiff Byers's allegation that, *inter alia*, "[m]embers of [Defendant FFA], as agents of the IRS, wrongfully charged

28

Plaintiffs and their proposed class illegal fees to electronically file ('e-file') their federal tax and information returns."[40]  FAC ¶ 1.  As noted previously, this allegation, combined with the others quoted above, satisfies the three elements of constitutional standing for Plaintiff Byers's IOAA/APA claim (i.e., injury in fact, causation, and redressability).[41, 42]  See Turicentro, 303 F.3d at 300 n.4 ("Facial attacks . . . contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true."); Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir. 2005) ("Injury-in-fact is not Mount Everest.").

As for Defendant FFA, it argues that Plaintiffs lack constitutional

---

[40] Or, as Plaintiffs put it, "[t]his [argument] ignores the allegation that plaintiff Stacie Byers did in fact pay H&R Block to e-file her tax returns."  Plaintiffs' Response to the Motions of Defendants Block and FFA, at 5.

[41] Defendant Block's point appears to be that Plaintiff Byers lacks constitutional standing if she was ineligible for the Free File Program, but that argument conflates the standing inquiry with the inquiry into whether Plaintiff Byers ultimately can recover.  As many courts have noted, "failure to state a claim upon which relief can be granted does not mean that federal question jurisdiction is lacking."  The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998)); see also Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 176–77 (3d Cir. 2000) ("[T]he City's argument against the Residents' standing conflates issues of standing and questions of proof.").

[42] Like Defendant Block, Defendant FFA also argues that Plaintiffs lack constitutional standing because they have not alleged that they were eligible to e-file for free as part of the Free File Program.  See Defendant FFA's Memorandum of Law at 29.  Unlike Defendant Block, however, Defendant FFA believes this means that "Plaintiffs have not adequately alleged a causal connection between the harm they allege and the conduct they challenge."  Id.  I reject this argument for the same reason I have rejected Defendant Block's argument – i.e., because it conflates the standing inquiry with the merits of Plaintiffs' claims and runs contrary to my duty to accept Plaintiffs' allegations of injury and causation as true at this stage of the action.

standing against it because it "makes only *free* services available through the Free
File Program and provides no services itself."  Defendant FFA's Memorandum of
Law at 30 n.11.  I reject this argument because, even if discovery will reveal the
truth of Defendant FFA's assertions, at this point I am required to accept as true
Plaintiffs' contrary assertion that Defendant FFA and its members charged them
and the proposed class fees to file their federal income tax returns electronically.
See FAC ¶¶ 1, 2, 20; see also Danvers Motor Co., Inc., 432 F.3d at 292 ("Because
we are bound to read the complaint as true, we cannot ignore Plaintiff's claims that
the BOP is 'illegal,' 'imposed' upon them, 'compelled,' and 'coercive.'") (internal
citations omitted).

### 3.  Prudential Standing

#### a.  Prudential Standing Doctrine

"Even when th[e] constitutional minimum has been met, judicially
created prudential limitations may defeat a party's standing to maintain a suit."
The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000).  With regard to the
prudential component of standing, the Supreme Court has observed:

> Although we have not exhaustively defined the prudential dimensions
> of the standing doctrine, we have explained that prudential standing
> encompasses "the general prohibition on a litigant's raising another
> person's legal rights, the rule barring adjudication of generalized
> grievances more appropriately addressed in the representative

branches, and the requirement that a plaintiff's complaint fall within
the zone of interests protected by the law invoked."

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen v.

Wright, 468 U.S. 737, 751 (1984)); see also Mariana v. Fisher, 338 F.3d 189,

204–05 (3d Cir. 2003).  Put more simply, prudential standing "embodies judicially

self-imposed limits on the exercise of federal jurisdiction."  Newdow, 542 U.S. at

11 (internal quotation omitted).

### b.  Applying Prudential Standing Doctrine to This Case

Plaintiffs have prudential standing to bring this action, and I find

Defendant FFA's arguments to the contrary unpersuasive.  See Defendant FFA's

Memorandum of Law, at 31–33.

Defendant FFA argues that Plaintiffs lack prudential standing,

because they are "rely[ing] on the potential standing of absent class members."

Defendant FFA's Memorandum of Law, at 32.  I disagree.  As the discussion

above has demonstrated, Plaintiffs have constitutional standing to bring this class

action.  See Section III.A.2, supra.  Plaintiffs therefore are not relying on the

potential standing of members of the proposed class, nor raising the legal rights of

others, such that they should be denied prudential standing.

With regard to the second prudential limitation on standing,

Defendant FFA argues that the two "central premises" of the First Amended

Complaint "amount only to generalized grievances regarding decisions made by

Congress and delegated to the IRS that are not appropriately addressed in federal

court."  Defendant FFA's Memorandum of Law, at 32.  Defendant FFA identifies

these two central premises as (1) the allegation that the agreements between

Defendants FFA and the IRS "wrongfully 'privatized' IRS *e-file* and the IRS's

quintessential government task of developing, receiving, collecting and processing

tax returns by allowing [FFA] members to reap profits by charging taxpayers and

tax preparers substantial and legally unauthorized fees to electronically file returns

with the IRS"; and (2) the allegation that in return for Defendant FFA's

commitments under the agreements Defendant IRS "agreed not to independently

develop and maintain its own tax return e-filing system, which it had otherwise

intended to do, and which all taxpayers and tax preparers could have used to

electronically prepare and/or file their federal tax and information returns with the

IRS at little or no cost."  FAC ¶¶ 17, 18; see also Defendant FFA's Memorandum

of Law, at 32.

I again disagree.   The First Amended Complaint certainly contains

the above-quoted allegations about the "wrongful privatization" of the IRS's tasks

and about the harm that Plaintiffs believe they and members of the proposed class

have suffered because of the IRS's decision not to compete with the FFA.  But

those allegations do not constitute an attempt to litigate "abstract questions of

wide public significance amounting to generalized grievances."  Mariana, 338

F.3d at 205.  Rather, they are part of the factual basis for Plaintiffs' two claims:

(1) for a refund of fees allegedly charged by Defendants in violation of the IOAA;

(2) and for treble damages and injunctive relief to redress the Corporate

Defendants' alleged violation of Section 1 of the Sherman Act.  See FAC ¶¶

53–85.  Plaintiffs therefore do not run afoul of the second prudential limitation on

standing, and Defendant FFA's contrary argument fails.[43]

Lastly, Defendant FFA argues that Plaintiffs lack prudential standing

to assert their IOAA/APA claim because it lies outside the "zone of interests"

protected by the IOAA.  See Defendant FFA's Memorandum of Law, at 33.  I

reject this argument because Plaintiffs' IOAA/APA claim is not so outlandish that

I must decline to adjudicate it.  See Davis by Davis v. Philadelphia Housing Auth.,

121 F.3d 92, 101 (3d Cir. 1997) ("[T]he zone of interests test is 'not meant to be

especially demanding.'") (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399

(1987)).  After all, there is federal case law enforcing the IOAA in the context of

---

[43] For the same reasons, I reject the Corporate Defendants' argument that I should not
adjudicate Plaintiffs' claims because they raise "political questions."  See Baker v. Carr, 369 U.S.
186 (1962).

appeals from a government agency's denials of refund petitions, <u>see, e.g.,</u> <u>Nat'l</u> <u>Ass'n of Broadcasters v. FCC</u>, 554 F.2d 1118 (D.C. Cir. 1976), I have found only one published decision refusing to apply the IOAA to a private entity, <u>see</u> <u>Thomas</u> <u>v. Network Solutions, Inc.</u>, 176 F.3d 500 (D.C. Cir. 1999), and I have found no published decision that has addressed the issue of whether there is a private right of action under the IOAA.  In this context, Plaintiffs' IOAA/APA claim is within the zone of interests protected by the IOAA, and they have prudential standing to assert it.[44]

## B.  Count I – Plaintiffs' IOAA/APA Claim

As mentioned above, the Corporate Defendants have moved to dismiss Count I (Plaintiffs' IOAA/APA claim) on the grounds that (1) the IOAA does not apply to them in this case; (2) that there is no express or implied private right of action under the IOAA; and (3) that the claim fails factually since the Corporate Defendants do not charge fees for the services they provide as part of the Free File Program.  In their responses, Plaintiffs have contested grounds (1) and (3) but not ground (2), since they say that Count I is a claim under the

---

[44] The First Amended Complaint includes an allegation that "Plaintiffs and members of the proposed class' injuries are within the zone of interests to be protected by 31 U.S.C. § 9701." FAC ¶ 61.  This is a legal conclusion, not an allegation of fact, so it does not affect my analysis on this issue.

Administrative Procedures Act, 5 U.S.C. § 702.

I will grant the Corporate Defendants' Rule 12(b)(6) motions to dismiss Count I as against them because I agree that the IOAA does not apply to them in this case.  In the alternative, I will dismiss Count I on the grounds that there is no express or implied private right of action under the IOAA, and that Plaintiffs cannot bring an APA claim against the Corporate Defendants, who are not "agencies" within the meaning of the APA.  (I need not address the argument that Plaintiffs' IOAA/APA claim fails factually.)  Count I therefore will be dismissed without leave to amend, except to the extent that Plaintiffs have asserted an APA claim against Defendant IRS.

### 1.  The IOAA Does Not Apply to the Corporate Defendants.

"[T]he starting point for interpreting a statute is the language of the statute itself," <u>Consumer Product Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980), and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."  <u>Id.</u>

As is clear from its text, the IOAA regulates only the charge for "a service or thing of value provided by an agency."[45]  In determining whether the

---

[45] <u>See</u> 31 U.S.C. § 9701(b) ("The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing

Corporate Defendants are subject to the IOAA's fee-setting rules, the question before me is therefore whether the electronic tax preparation and filing services provided by the Corporate Defendants pursuant to their agreements with the IRS can be considered "service[s] or thing[s] of value provided by an agency."  The Corporate Defendants argue that this question should be answered in the negative, and, as explained below, I agree.

In almost all of the actions brought under the IOAA, the fees at issue were set by an agency of the United States government, see, e.g., Ayuda, Inc. v. Attorney General, 848 F.2d 1297 (D.C. Cir. 1988) (upholding fees charged by the Immigration and Naturalization Service against an IOAA challenge), so courts rarely have been confronted with the issue of whether the IOAA applies to fees charged by private entities like the Corporate Defendants.  In fact, I am aware of only one reported decision that has addressed the issue:  Thomas v. Network Solutions, Inc., 176 F.3d 500 (D.C. Cir. 1999), aff'g 2 F. Supp. 2d 22 (D.D.C. 1998).  I will summarize Thomas and then apply its principles to this case.[46]

_____

of value provided by the agency.").  In Title 31 of the United States Code, "'agency' means a department, agency, or instrumentality of the United States Government."  31 U.S.C. § 101 (2008).

[46] My discussion will focus on the Court of Appeals' analysis, because the district court's dismissal of the IOAA claim was based entirely on the fact that the plaintiffs sought to apply the IOAA to fees charged by a private entity.  See Thomas, 2 F. Supp. 2d 22, 36 (D.D.C. 1998) ("The problem, however, is that the statute applies only to a 'service or thing of value provided

### a.  **Thomas v. Network Solutions, Inc., 176 F.3d 500 (D.C. Cir. 1999)**

In Thomas, the plaintiffs alleged that the National Science Foundation ("NSF") and Network Solutions, Inc. had violated the IOAA by charging improper fees to register and maintain internet domain names.  176 F.3d at 505.  After NSF (a federal agency) assumed responsibility in 1991 and 1992 for "coordinating and funding the management of the nonmilitary portion of the Internet infrastructure," id. at 504, it "solicited competitive proposals to provide a variety of infrastructure services, including domain name registration services." Id.  Network Solutions submitted one such proposal, and was chosen by NSF to become "the exclusive registry and exclusive registrar for the '.com,' '.org,' '.net,' and '.edu' top-level domains."[47]  Id. at 505.  The Court of Appeals for the District of Columbia Circuit summarized as follows the cooperative agreement between NSF and Network Solutions:

---

by an agency.'  31 U.S.C. § 9701(b).  NSI is clearly not a federal agency, and the NSI fees are clearly not charged by a federal agency for federal services. . . .  Therefore, the Court must dismiss Count Four of the Amended Complaint."); see also id. at 32–33 (using the same reasoning to dismiss the IOAA claim in Count Three).

[47] "As a registry, Network Solutions maintain[ed] a top-level domain's zone files, the directory databases listing domain names and their Internet Protocol numbers."  Id. at 505.  "As registrar, Network Solutions act[ed] as go-between for domain name holders and the registry, providing various services, including the registration of domain names on a first-come, first-served basis."  Id.

The agreement provided that NSF would compensate Network
Solutions in accordance with a cost-plus-fixed-fee arrangement. The
cost-plus-fixed-fee arrangement ended on September 14, 1995.
Pursuant to an amendment to the agreement, Network Solutions
started charging domain name registrants a one-time registration fee
of $100 for registration services for the first two-year period, and $50
per year thereafter, with 70 percent of the fees going to Network
Solutions as 'consideration for the services provided,' and 30 percent
set aside, in a custodial account held by Network Solutions on NSF's
behalf, for preserving and enhancing the 'Intellectual Infrastructure of
the Internet.' The 30 percent portion – the 'Preservation Assessment'
– was discontinued for registrations made on or after April 1, 1998.

Id. A footnote at the end of the above-quoted passage explains that "[a]t that time,

Network Solutions started charging $70 for registration services for the first two-

year period, and $35 per year thereafter. Later in 1998, NSF transferred

responsibility for administering its cooperative agreement with Network Solutions

to the Department of Commerce." Id. n.7.

     In determining whether the fees charged by Network Solutions were

subject to the requirements of the IOAA,[48] the Thomas Court began its analysis by

---

[48] These requirements are set forth in 31 U.S.C. § 9701(b), which reads as follows:

(b) The head of each agency (except a mixed-ownership Government corporation)
may prescribe regulations establishing the charge for a service or thing of value
provided by the agency. Regulations prescribed by the heads of executive
agencies are subject to policies prescribed by the President and shall be as uniform
as practicable. Each charge shall be –
    (1) fair; and
    (2) based on –
        (A) the costs to the Government;
        (B) the value of the service or thing to the recipient;
        (C) public policy or interest served; and

declaring that "[g]overnment agencies cannot escape responsibility for failing to

perform their statutory duties by hiring private parties to perform those duties."

Id. at 510.  The Court then noted that the IOAA might have applied to the fees

charged by Network Solutions "[i]f a statute [had] required NSF to register domain

names, and [if] NSF [had] farmed this out to Network Solutions."  Id.  But, the

Court observed, "that is not the situation before us."  Id.  Instead, the statute at

issue in Thomas – 42 U.S.C. § 1862(g) – authorized the NSF to "foster and

support access by the research and education communities to computer networks

which may be used substantially for purposes in addition to research and

education in the sciences and engineering, if the additional uses will tend to

increase the overall capabilities of the networks to support such research and

education activities."[49]  42 U.S.C. § 1862(g) (2008).  Regardless of what this

statutory language actually authorized the NSF to do, the Thomas Court was

certain that it did not require the NSF to register and renew domain names.  Id.

---

(D) other relevant facts.

31 U.S.C. § 9701(b) (2008).

[49] This authorization arose out of the NSF's mandate "to foster and support the
development and use of computer and other scientific and engineering methods and technologies,
primarily for research and education in the sciences and engineering."  42 U.S.C. § 1862(a)(4);
see also 42 U.S.C. § 1862(g) ("In carrying out subsection (a)(4) of this section, the Foundation is
authorized to . . . .").

The Court therefore concluded that the NSF was not subject to any statutory mandate that would require its contractor, Network Solutions, to set its fees in accordance with the requirements of the IOAA.[50]  Id.

The Court then addressed the plaintiffs' argument that Network Solutions' fees should be subject to the IOAA because Network Solutions had been hired by a federal agency and allegedly was acting as NSF's agent.  Quoting a paragraph in the plaintiffs' amended complaint, the Court found that the plaintiffs had admitted that "Network Solutions – not NSF – controlled the domain name registration process," and that that admission scuttled the plaintiffs' argument.[51]  Id. at 510–11 n.17.  As the Court put it:  "[T]he [IOAA] applies only to 'a service or thing of value *provided by an agency*.'  Here, a private party (Network Solutions) performed the domain name registration services – and did so as it saw fit."  Id. at 510 (emphasis in original) (internal citation omitted).

---

[50] The Thomas Court also distinguished two Comptroller General decisions on this ground:  "In In re: FEC-Sales of Microfilm Copies of Candidate and Committee Reports, 61 Comp. Gen. 285 (1982) and In re: Retention of Fees Received by EPA Contractors Providing Information Services to the Public, 1975 WL 7967 (Comp. Gen. Oct. 20, 1975), federal agencies hired private firms to produce agency records on the agencies' behalf.  Both cases involved services that statutes required the agencies to perform.  There is no such statutory mandate here."  Thomas, 176 F.3d at 511.

[51] The quoted portion of the amended complaint read as follows:  "NSF has not and does not directly supervise or manage any NSI activities pertaining to the Domain Name registration process.  The only 'control' and 'oversight' exercised by NSF over NSI and the Domain Name registration process is the contractual requirement that NSF submit certain limited quarterly and annual reports."  176 F.3d at 510–11.

The Thomas Court next turned to the plaintiffs' argument that the

IOAA should be construed broadly so that "domain name registration is a

*government* service or thing of value within the Act's meaning."  Id. at 511

(emphasis in original); see also Ayuda, Inc. v. Attorney General, 848 F.2d 1297,

1300 (D.C. Cir. 1988) ("[O]ur prior cases teach unmistakably that the phrase

'service or thing of value' is to be construed broadly.").  This argument failed to

persuade the Court, which described domain name registration as a "recent and

novel function" that Congress had not required any federal agency to perform and

that, at least in the early days of the internet, had been performed by private

entities.  Id.  The Court therefore concluded that domain name registration, despite

its impact on the public,[52] was not a "quintessential government service" that NSF

was prohibited from farming out to a private entity like Network Solutions.  Id.

The Thomas Court ended its analysis of the IOAA by observing that

"[t]he Act is a nonfit in other ways."  Id.  Specifically, the IOAA "applies to

monies bound for the federal treasury," id., and is part of a statutory scheme that

requires "official[s] or agent[s] of the United States Government having custody or

---

[52] Disagreeing with the plaintiffs' claim that the "public purpose" of domain name registration made it a quintessential government service subject to the IOAA, the Thomas Court quoted the following language from San Francisco Arts & Athletics, Inc. v. United States Olympic Comm'n, 483 U.S. 543–44 (1987):  "[T]hat a private party performs a function which serves the public does not make its acts governmental."

possession of public money" to "keep the money safe" and "deposit [it] in the Treasury as soon as practicable," with the penalty for noncompliance being removal from office. 31 U.S.C. § 3302(a), (b), (d) (2008). In the Court's view, this statutory scheme was not designed for private actors like Network Solutions, which was entitled to keep the fees it collected under its cooperative agreement with NSF. 176 F.3d at 511.

Relying on "all these reasons," the Thomas Court held that "the [IOAA] does not cover the fees Network Solutions charged for its services." Id.

### b.  Applying Thomas to This Case.

Applying Thomas's principles to this case, I conclude that the fees charged by the Corporate Defendants are not subject to the requirements of the IOAA. Therefore I will grant the Corporate Defendants' Rule 12(b)(6) motions to dismiss Count I as against them on this ground.

The most obvious similarity between this case and Thomas is that both raise the issue of whether the IOAA may be applied to fees charged by a private entity. The district court in Thomas rejected this notion out of hand, see Thomas, 2 F. Supp. 2d 22, , 32–33, 36, while the Court of Appeals observed that the IOAA was a "nonfit" when applied to a private entity. See Thomas, 176 F.3d at 511. Even under the Court of Appeals' more generous analysis, the IOAA

could apply to fees charged by a private entity only under special circumstances that are not present in this case.  Specifically, the IOAA would apply only if:  (1) the private entity were tasked with performing a federal agency's statutory duty; (2) the federal agency effectively controlled the private entity's conduct; or (3) the federal agency contracted with the entity to provide a quintessential government service.  See id.

### i.  The IRS Did Not Farm Out a Statutory Duty to the Corporate Defendants.

Like the NSF in Thomas, the IRS in this case was not subject to any statutory mandate that would require the Corporate Defendants to set their fees in accordance with the requirements of the IOAA.  The statutory authorization for the Free File Program is found in § 2001(a) of the RRA, which declared that:

(a) In general.–It is the policy of Congress that –

(1) paperless filing should be the preferred and most convenient means of filing Federal tax and information returns;
(2) it should be the goal of the Internal Revenue Service to have at least 80 percent of all such returns filed electronically by the year 2007; and
(3) the Internal Revenue Service should cooperate with and encourage the private sector by encouraging competition to increase electronic filing of such returns.

Pub. L. No. 105-206, Title II, 112 Stat. 723 (1998); accord 26 U.S.C. § 6011(f) (2008); FAC, Exhibit A, art. I (identifying one of objectives of the Free File

Program as "[s]upporting the IRS's statutory goals of increased e-filing, pursuant to the IRS Restructuring and Reform Act of 1998, which encouraged the IRS to set a goal of having 80% of Federal tax and information returns filed electronically by the year 2007").  As in Thomas, I need not determine the precise scope of the Congressional authorization in subsection (a)(3), for that language certainly did not require the IRS to create the Free File Program or anything like it.  176 F.3d at 510.  The language is permissive – "the Internal Revenue Service should . . ." – and gave the IRS wide discretion to determine how best to "cooperate with and encourage the private sector" and "encourag[e] competition to increase electronic filing."  Like the NSF in Thomas, the IRS decided that the Free File Program represented the best way to achieve its electronic filing goals, but in so doing it did not "farm out" a statutory duty.[53]  Id.  This aspect of Thomas's reasoning therefore compels me to conclude that the IOAA does not apply to the fees allegedly charged by the Corporate Defendants.

### ii.  The IRS Did Not Effectively Control the Corporate Defendants.

The IRS's relationship with Defendant FFA is also analogous to the

---

[53] Plaintiffs' allegations that the IRS has a "statutory duty to collect tax and information returns from taxpayers," FAC ¶ 56, and that it "*requires* certain taxpayers to e-file their tax and information returns through IRS *e-file,* " id., do not affect my conclusion, because they do not say that the Free File Program itself was statutorily mandated.

NSF's relationship with Network Solutions in <u>Thomas</u>.  Recall that in <u>Thomas</u> the

Court of Appeals relied on allegations in the plaintiffs' complaint to find that

"Network Solutions – not NSF – controlled the domain name registration

process," and that the IOAA therefore would not apply to Network Solutions' fees

on the ground that Network Solutions was NSF's "agent."  <u>Id.</u> at 510–11 n.17.

Here, Plaintiffs do not concede the issue,[54] but the 2002 and 2005 Agreements

establishing the Free File Program show that the Corporate Defendants control the

content of the services they provide, and that they are thus not the IRS's

"agents."[55]  The IOAA therefore does not apply to the Corporate Defendants'

_____

[54] <u>See, e.g.</u>, FAC ¶ 18 ("Pursuant to the [FFA's] agreement with the IRS, the Corporate Defendants and members of the [FFA] agreed to develop and maintain the IRS's electronic tax forms and filing system (IRS *e-file*) for the IRS under the IRS's direct guidance, supervision and control."); <u>id.</u> ¶ 54 ("At all material times hereto, the Corporate Defendants acted on behalf of and as agents of the IRS.").  In light of the 2002 and 2005 Agreements (and their accompanying Memoranda of Understanding), which clearly spell out the relationship between the IRS and the FFA, I am not required to credit these bald assertions and legal conclusions.  <u>See</u> <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).

[55] The most significant provisions in the 2002 and 2005 Agreements are listed below:

- The 2002 Free On-Line Electronic Tax Filing Agreement (FAC, Exhibit A)
    - Article V.A:  "The IRS will host and maintain the Web Page."
    - Article V.C:  "Taxpayers will be able to use [FFA] Participants' software to prepare and electronically file their own personal income tax returns using proprietary processes and systems which such Participants host and maintain."
- The 2005 Free On-Line Electronic Tax Filing Agreement Amendment (FAC, Exhibit B)
    - Article IV.A:  "IRS and the Executive Director and Alliance attorney are developing a memorandum of understanding (MOU) that would provide structure for the roles and responsibilities for both the IRS and FFA leadership.  The issues that are included in the draft MOU include tasks such as:
        1. Screening offers and web sites of members as part of the Alliance's

alleged fees on this ground.

### iii.  The Corporate Defendants Do Not Provide a Quintessential Government Service.

Plaintiffs argue strenuously that <u>Thomas</u> is distinguishable from this case because, as they allege in their First Amended Complaint, "[t]he option to file federal tax and information returns electronically with the IRS is a service or thing of value within the meaning of 31 U.S.C. § 9701."[56]  FAC ¶ 57.  I disagree. Assuming that <u>Thomas</u>'s broad interpretation of the phrase "service or thing of value" was not dictum,[57] it is clear that electronic tax preparation and filing, as

_____

        suitability/filing season readiness program;

        2.  Monitoring of member offerings and member web sites;

        3.  Participation in review of decisions when removing a member from the irs.gov Free File web page and the reinstatement of the member's site after a security or disclosure breach; and

        4.  Providing for a dispute resolution process that could be invoked by Alliance members whose offerings are rejected or removed from irs.gov.

As anticipated, the December 20, 2005 Memorandum of Understanding (Defendant Block's Motion, Exhibit C; Defendant FFA's Motion, Exhibit 4) established detailed standards of practice for FFA members, <u>see id.</u> art. IV, as well as procedures for the IRS and/or the FFA Executive Director to remove (or refuse to post) FFA members' listings from the Free File website and for the affected member to administratively appeal any such adverse action.  <u>See id.</u> arts. VII and VIII.  The January 12, 2007 Memorandum of Understanding made only minor changes to these standards of practice and administrative procedures.  <u>See</u> Defendant Block's Motion, Exhibit D; Defendant FFA's Motion, Exhibit 5.

   [56] This is another bald assertion/legal conclusion that I am not required to credit.   <u>See</u> <u>Morse</u>, 132 F.3d at 906.

   [57] <u>See</u> <u>Thomas</u>, 176 F.3d at 511 ("This might seem sufficient to indicate that the [IOAA] does not apply.  But if we give the section a broader interpretation, . . . .").

provided through the Free File Program or IRS e-file, is neither a "government service or thing of value" nor a "quintessential government task" nor anything else Plaintiffs would call it in an effort to bring it within the scope of the IOAA.  Like the domain name registration service at issue in Thomas, electronic tax preparation and filing is a "recent and novel" option, 176 F.3d at 511, and though Congress has passed legislation to encourage it, Congress clearly has decided that the IRS need not monopolize it.  See H.R. REP. NO. 107-575, p. 38 (2002) ("[T]he IRS stated that it did not intend to enter into the tax preparation software business; instead, it intended to work in partnership with industry to expand the electronic filing of tax returns. . . .  The Committee strongly believes in the industry-IRS partnership concept . . . .").  In my view, the Court of Appeals in Thomas got it right when it wrote that "[s]imply because NSF might have been able to perform domain name registration does not transform this activity into a *government* service or thing of value."  176 F.3d at 511 (emphasis in original).  Similarly, the fact that the IRS might have been able to provide electronic tax preparation and filing services to the public without any help from the private sector does not make electronic tax preparation and filing a government "service or thing of value" within the meaning of the IOAA.  Relying on the above-summarized reasoning in

Thomas,[58] I therefore hold that the electronic tax preparation and filing services provided through the Free File Program and IRS e-file are not "service[s] or thing[s] of value" within the meaning of the IOAA.

### iv.  The Cases Cited By Plaintiffs Are Distinguishable and Inapposite.

Plaintiffs cite several cases for the proposition that "a private entity is subject to the same restrictions as a government agency when it is performing a government function."  Plaintiff's Response to Intuit's Motion, at 11.  All of these cases are distinguishable and inapposite; they do not affect my conclusion that the fees allegedly charged by the Corporate Defendants are not subject to the IOAA.

The first case Plaintiffs cite is Motor Coach Indus., Inc. v. Dole, 725 F.2d 958 (4th Cir. 1984).  The issue in Motor Coach was whether federal procurement guidelines had to be followed where the Federal Aviation Administration (FAA) had waived millions of dollars' worth of fees against air carriers at Dulles International Airport in return for the air carriers' creation and funding of a trust that would pay for the expansion of bus transportation at the struggling airport.  Id. at 960–62.  The purpose of this scheme was to allow the

---

[58] Like the Thomas Court, I also find applicable here the rule that a private party's acts are not governmental just because they serve the public.  See 176 F.3d at 511 n.18 (quoting San Francisco Arts & Athletics, Inc., 483 U.S. at 543–44).  Thus, the "public purpose" of the Free File Program or IRS e-file does not make the acts of the FFA or its members (including the Corporate Defendants) governmental within the meaning of the IOAA.

FAA to fund the expansion of bus transportation with the air carriers' money (thereby avoiding the need for additional funds from Congress), so it was not surprising that the FAA exercised substantial control over the trust's activities.  Id. at 961 ("Officially the airlines were the trust settlors, but the FAA maintained firm control over vital aspects of the trust.").  When the losing bidder for the bus transportation contract sued to enjoin the activities of the trust, it also was not surprising that the Court of Appeals held that the trust was public in character, and that its expenditures therefore had to comply with the applicable federal procurement guidelines.  Id. at 965.

It should be noted first that Motor Coach does not stand for the proposition that a private entity is subject to the same restrictions as a government agency when it is performing a government function.[59]  Instead, it stands for the proposition that a private entity is subject to those restrictions when it is controlled by a government agency.  Motor Coach is therefore consistent with Thomas, and distinguishable from this case on the ground that the IRS exercises little control over the FFA and the Free File Program.[60]

_____

[59] Before the FAA established the trust at issue in Motor Coach, bus transportation at Dulles International Airport had been provided by a private company.  Id. at 961.

[60] The FAA's involvement in the Motor Coach trust and the IRS's involvement in the Free File Program are hardly comparable.  As the Court of Appeals wrote:

Plaintiffs' reliance on two Controller General decisions is also misplaced.[61]  In <u>Contractors Collecting Fees at Agency-Hosted Conferences</u>, No. B-306663, 2006 WL 39435 (Comp. Gen. Jan. 4, 2006), the Comptroller General concluded that the National Institutes of Health (NIH) "may not charge an attendance fee at conferences and retain the proceeds, nor permit its contractor to do so, because NIH lacks statutory authority."  2006 WL 39435, at *1.  The key to this decision was not that any fee charged by the NIH's contractor would be subject to the IOAA but rather that, in the absence of statutory authority, neither the NIH nor its contractor could collect *and retain* a conference attendance fee. (The Comptroller General held that the proceeds from any fee charged would have

_____

The documents governing the Trust not only made the FAA the sole beneficiary, but gave the agency a prominent, if not exclusive, role in the Trust's administration.  The FAA established the airlines' contribution formula, monitored collections with its own staff, exercised final approval power over disbursements, and participated in every phase of the decision to award Eagle the bus contract.

<u>Id.</u>  The IRS's relationship with Defendant FFA and the Free File Program is completely different.  Under the Free File Program, the IRS makes its website (irs.gov) available to the FFA's members, who control the particulars of the tax preparation and filing services they want to provide.  <u>See</u> FAC, Exhibits A and B.  The IRS's role is limited to policing the website and ensuring that the services provided by the FFA's members meet the standards set forth in the governing agreements.  <u>Id.</u>

[61] "While the decisions of the Comptroller General are not binding, . . . the General Accounting Office has special expertise in this area, and its decisions may provide useful guidance to the court."  <u>DGS Contract Serv., Inc. v. United States</u>, 43 Fed. Cl. 227, 238 (Fed. Cl. 1999).

to be deposited in the Treasury under the Miscellaneous Receipts Statute, 31 U.S.C. § 3302(b).  Id.)  This case is distinguishable, because the IRS had more than enough statutory authority to create the Free File Program.  See IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 2201(a)(3), 112 Stat. 723 (1998) ("The Internal Revenue Service should cooperate with and encourage the private sector by encouraging competition to increase electronic filing of such returns.").[62]

SBA's Imposition of Oversight Review Fees on PLP Lenders, No. B-300248, 2004 WL, 77861 (Comp. Gen. Jan. 15, 2004) turned on the same issue. In that case, the Small Business Administration ("SBA") operated a program pursuant to which lenders in its Preferred Lender Program ("PLP") could make SBA-guaranteed loans without prior SBA approval, provided that the SBA reviewed these loans at least annually.  Id. at *1.  The problem with the program was that the private firm the SBA had contracted with to conduct these annual reviews was compensated through fees charged to the PLP lenders rather than through the SBA's congressionally appropriated funds.  Id.  As in Contractors

---

[62] The Comptroller General's lack of focus on the IOAA is revealed by its failure to mention the IOAA in its suggestion that the NIH ask Congress to grant it statutory authority to collect and retain attendance fees.  Contractors Collecting Fees, 2006 WL 39435, at *2 ("Congress may, of course, enact legislation authorizing an agency hosting a conference on behalf of the government to collect and retain an attendance fee.  Should Congress wish to grant agencies such authority, agencies may in turn permit their contractors to collect such a fee.").

Collecting Fees at Agency-Hosted Conferences, the Comptroller General held that

this practice was unlawful in the absence of statutory authority for the SBA or its

contractor to collect *and retain* fees from the PLP lenders.  Id.  Again, the key

point was not that the fees were subject to the IOAA,[63] but that "the SBA ha[d]

improperly augmented its appropriations by not bearing the costs of the PLP

oversight reviews itself and instead using the fees collected from PLP lenders to

pay for these costs."[64]  Id.  This reasoning is not applicable to this case, where the

IRS had statutory authority to create the Free File Program and IRS e-file and

where, as explained above, the available authorities have led me to conclude that

the IOAA does not apply to the fees allegedly charged by the Corporate

Defendants.

### 2.  Plaintiffs Cannot Sue the Corporate Defendants Under the APA.

---

[63] The SBA cited Thomas "in contending that the Miscellaneous Receipts Statute [31 U.S.C. § 3302] does not apply to money in the hands of a government grantee and, by analogy, a government contractor such as Thompson Cobb."  2004 WL 77861, at *8.  In rejecting this argument, the Comptroller General correctly noted that the Thomas Court allowed Network Solutions to charge and retain fees for its services because the NSF was under no statutory duty to provide those services.  Id.  The SBA, on the other hand, was statutorily required to review the PLP lenders so Thomas was consistent with the Comptroller General's holding.  Id.

[64] The remedy imposed by the Comptroller General was not a refund of fees unlawfully charged under the IOAA but rather an order for the SBA to "cease these practices unless and until Congress authorizes them, and in the meantime, . . . [to] identify the review costs paid by lenders to its contractor and pay these costs itself from appropriations accounts available for this purpose."  2004 WL 77861, at *9.

The Corporate Defendants, believing that Count I is a claim under the IOAA, have argued that no private right of action should be implied under the IOAA.  Plaintiffs' response is that they "are *not* seeking to imply a private right of action under the IOAA."  Plaintiffs' Response to Intuit's Motion, at 17.  "Rather, they are pursuing an equitable remedy under the provisions of the Administrative Procedures Act."[65]  Id.  As explained below, I conclude that Plaintiffs cannot sue the Corporate Defendants under the APA, because they are not "agencies" within the meaning of the APA.  Therefore, to the extent that Count I asserts a claim against the Corporate Defendants under the APA, it will be dismissed on this ground.[66]

Under the APA, "'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency."[67]  5 U.S.C. § 551(1), 701(b)(1) (2008).  Numerous courts have struggled

_____

[65] Plaintiffs correctly cite Bowen v. Massachusetts, 487 U.S. 879, 893–94 (1988) and Zellous v. Broadhead Assocs., 906 F.2d 94, 99 (3d Cir. 1990) for the proposition that a refund of fees unlawfully charged under the IOAA is a permissible remedy under the APA.  See Plaintiffs' Response to Intuit's Motion, at 17–19 (also citing Nat'l Ass'n of Broadcasters v. FCC, 554 F.2d 1118, 1130 (D.C. Cir. 1976) and Air Transp. Assoc. of America v. Civil Aeronautics Bd., 732 F.2d 219 (D.C. Cir. 1984)).

[66] Like the Corporate Defendants, I believe Count I of the First Amended Complaint is more naturally read as asserting a claim under the IOAA, not the APA.  Therefore I hold in the next section that the lack of an express or implied private right of action under the IOAA also requires dismissal of Count I as against the Corporate Defendants.

[67] This definition also contains numerous exceptions not applicable to this case.

with the application of this language to particular factual situations, but in each of them "the party sought to be labeled as an agency under the APA was first recognized as being a governmental entity." Internat'l Brominated Solvents Ass'n v. American Conference of Governmental Industrial Hygienists, Inc., 393 F. Supp. 2d 1362, 1380 (M.D. Ga. 2005) (collecting cases).  Only after making the threshold determination that the party in question is a governmental entity may the court consider the issue of whether its characteristics make it a *de facto* government agency for purposes of the APA.[68]  Id.  If the party in question is not an "agency," its actions are not subject to review under the APA.  See 5 U.S.C. §§ 551(13), 702, 704, 70; see also Sydnor v. Office of Personnel Mgmt., Civ. A. No. 06-14, 2007 WL 172339, at *4 (E.D. Pa. Jan. 23, 2007) ("In order to state a claim under the APA, Plaintiff must challenge an 'agency action,' since it is only review

---

[68] The Court of Appeals for the District of Columbia Circuit has observed that "any general definition [of 'agency'] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of government done."  Washington Research Project, Inc. v. Dep't of Health, Educ. & Welfare, 504 F.2d 238, 245–46 (D.C. Cir. 1974).  Thus, "[t]he unavoidable fact is that each new arrangement must be examined anew and in its own context."  Id. at 246.  One court summarized the reported cases well when it wrote the following:

> [T]he criteria utilized in making such a determination are [1] whether the entity has authority to act with the sanction of government support, or [2] has any authority in law to make decisions, or [3] has substantial authority in the exercise of specific functions.

In re Gideon, Inc., 158 B.R. 528, 531 (Bankr. S.D. Fla. 1993) (footnotes omitted).

'thereof' that the APA permits."); <u>Window Sys., Inc. v. Manchester Mem'l Hosp.</u>, 424 F. Supp. 331, 336 (D. Conn. 1976) ("[T]he APA is not applicable to suits between private parties.").

My analysis here is brief because I conclude that none of the Corporate Defendants is a governmental entity.  Plaintiffs acknowledge in their First Amended Complaint that Defendant FFA is a limited liability corporation ("LLC"), <u>see</u> FAC ¶ 10 and that Defendants Block (also an LLC) and Intuit (a corporation) have been FFA members "at all times relevant to this lawsuit."  <u>Id.</u> ¶ 11; <u>accord</u> FAC, Exhibit A (describing the FFA as a "non-profit corporation (under the provisions of 26 U.S.C. § 501(c)(3)) formed under the auspices of, and affiliated with, the Council for Electronic Revenue Communication Advancement").  Since none of the Corporate Defendants is a governmental creation, I hold that none is an agency for purposes of the APA.[69]  <u>See</u> <u>Internat'l</u>

---

[69] The <u>International Brominated</u> Court seemed willing to entertain the notion that a private entity's mere "contractual relationship" with the federal government could make it a governmental entity and therefore perhaps an "agency" under the APA. 393 F. Supp. 2d at 1380. But I have found no controlling authority to that effect.  On the contrary, the case law I have examined appears to support the opposite conclusion.  <u>See</u> <u>United States v. Pa. Envtl. Hearing Bd.</u>, 584 F.2d 1273 (3d Cir. 1978) (holding that a private company operating under a federal contract was not a federal "department, agency, or instrumentality" for the purposes of section 313 of the Federal Water Pollution Control Act Amendments of 1972); <u>Mark v. Borough of Hatboro</u>, 856 F. Supp. 966, 974 (E.D. Pa. 1994) ("[T]he Company is an independent contractor with whom the Borough has contracted to provide firefighting services.  The delegation of this function does not transform the Company into a state actor.").

Brominated Solvents Ass'n, 393 F. Supp. 2d at 1380 ("[Plaintiffs] do not identify any particular statute, order, regulation, or other similar legislative action that would support the view that ACGIH is a governmental creation.").  Count I therefore must be dismissed pursuant to Rule 12(b)(6) to the extent that it asserts an APA claim against the Corporate Defendants.[70]

### 3.  The Court Will Not Imply a Private Right of Action Under the IOAA.

As I noted in the previous section, Count I of the First Amended Complaint is more naturally read as asserting a claim under the IOAA (not the APA), despite Plaintiffs' assertions to the contrary.  For Plaintiffs to be able to bring such a claim, there must be an express or implied private right of action

---

[70] I would reach the same conclusion even if I were to consider whether the Corporate Defendants' characteristics make any of them a *de facto* agency under the APA.  Unlike the "modern day post exchange" at issue in Ellsworth Bottling Co. v. United States, 408 F. Supp. 280 (W.D. Okla. 1975), none of the Corporate Defendants "has the authority to act with the sanction of the Government behind it."  Id. at 282 (holding that the AAFES was an agency under the APA where, by statute, its contracts were considered contracts with the federal government and any judgments against it were paid out of the federal Treasury).  Moreover, unlike the Professional Standards Review Organization ("PSRO") at issue in Public Citizen Health Research Group v. Dep't of Health, Educ. & Welfare, 449 F. Supp. 937 (D.D.C. 1978), none of the Corporate Defendants "has any authority in law to make decisions."  Id. at 941 (holding that the PSRO was an agency under the APA where "in practically all cases, [Medicare or Medicaid] benefits are not paid unless the PSRO makes its conclusive affirmative determinations of medical necessity").  Finally, unlike the Property Review Board ("PRB") at issue in Conservation Law Found. of New England, Inc. v. Harper, 587 F. Supp. 357 (D. Mass. 1984), none of the Corporate Defendants has substantial authority in the exercise of a specific government function.  See id. at 364 (finding that the PRB, which was created by executive order, was an agency under the APA, where the plaintiffs "ha[d] alleged facts tending to show that the PRB possesses broad power, whether formal or informal, to control the sale or other disposition of public property").

under the IOAA.  The Corporate Defendants have argued in their motions to dismiss that no such private right of action exists and that Count I therefore must be dismissed pursuant to Rule 12(b)(6).  I agree for the reasons set forth below.

### a.  The Governing Law

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  "Many federal statutes provide a private right of action through their express terms," but "[o]ther federal statutes . . . merely define rights and duties, and are silent about whether an individual may bring suit to enforce them."  Wisniewski v. Rodale, Inc., 510 F.3d 294, 297 (3d Cir. 2007).  If the federal statute in question does not provide an express private right of action, I must determine whether the statute confers an implied private right of action.  Id.

Determining whether a federal statute confers an implied private right of action involves a two-step inquiry:

> (1) Did Congress intend to create a personal right?; and (2) Did Congress intend to create a private remedy?  Only if the answer to both of these questions is "yes" may a court hold that an implied private right of action exists under a federal statute.

Wisniewski, 510 F.3d at 301; see also Sandoval, 532 U.S. at 286 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays

an intent to create not just a private right but also a private remedy.").

### b.  Applying the Governing Law to This Case

#### i.  The IOAA Does Not Provide an Express Private Right of Action.

"Determining whether a statute explicitly provides a private remedy involves a relatively straightforward inquiry."  Three Rivers Center v. Housing Authority of the City of Pittsburgh, 382 F.3d 412, 420 (3d Cir. 2004).  That is, "[a] court must look to the text of the statute to see if it states, by its terms, that a private party may bring suit to enforce it."  Id. (citing Hallstrom v. Tillamook County, 493 U.S. 20, 25 (1989)).  Having done this, I conclude that the IOAA does not provide an express private right of action for its enforcement.

#### ii.  It is Unclear Whether Congress Intended for the IOAA to Create a Personal Right.

In inquiring whether Congress intended for the statute in question to create a personal right, I must "review[] the 'text and structure' of the statute to determine whether the statute contain[s] 'rights-creating' language that focuses on the 'individual protected' rather than the 'person regulated.'"  Wisniewski, 510 F.3d at 301–02 (quoting Sandoval, 532 U.S. at 288–89).  As explained below, I find that this inquiry does not yield a clear answer in this case because, although

the IOAA focuses on the "person regulated," it also contains "rights-creating" language.  Like the Court of Appeals in <u>Wisniewski</u>, I need not reach a firm conclusion on this issue, for the next section of this opinion will show that Congress did not intend to create a private remedy for violations of the IOAA.

   The IOAA clearly and consistently focuses on the "person regulated" – i.e., the "agency" – and does not mention any "individual protected."  In subsection (a), the text declares that "each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible."  31 U.S.C. § 9701(a).  In subsection (b), the "head of each agency" is given authority to "prescribe regulations establishing the charge for a service or thing of value provided by the agency," and, if she exercises that authority, subsection (b) further requires that "[e]ach charge shall be – (1) fair; and (2) based on – (A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts."  31 U.S.C. § 9701(b).[71] The IOAA's focus on the conduct of government agencies is consistent with the intent behind its creation – i.e., "[t]o help defray the expenses of an expanding federal bureaucracy . . . [by] permit[ting] federal agencies to recoup the costs of

---

[71] Subsection (c) simply makes it clear that the IOAA does not affect existing federal statutes that prohibit certain charges or prescribe other bases for determining charges.  31 U.S.C. § 9701(c).

performing certain services by collecting fees from the beneficiaries."  Note, The Assessment of Fees by Federal Agencies for Services to Individuals, 94 HARV. L. REV. 439, 439 n.1 (1980) (citing 97 CONG. REC. 4809 (1951) (remarks of Rep. Yates)); see also Fed. Power Comm'n v. New England Power Co., 415 U.S. 345, 349 ("The report on the Act, H.R. REP. NO. 384, 82d Cong., 1st Sess., 2, states that '[t]he Committee is concerned that the Government is not receiving full return from many of the services which it renders to special beneficiaries.'"); S. REP. NO. 2120, 81st Cong., 2d Sess. 3 (1950) ("[T]here is no thought here to establish a system of fees for fundamental Government services, but only to explore the feasibility and fairness of shifting to special beneficiaries the expense now being borne for them by the taxpayers at large.").

Despite the IOAA's focus on the "person regulated" rather than the "individual protected," I cannot conclude that Congress did not intend for the IOAA to create a personal right because the fee-setting criteria in subsection (b) may plausibly be read as creating a right to be charged only fees that comport with those criteria.  See Note, 94 HARV. L. REV., at 455 ("Although the legislative history section 483a[, now codified at 31 U.S.C. § 9701,] is strangely silent on the meaning of [the criteria in subsection (b)], the drafters and interpreters of the statute noted that agencies are authorized under section 483a to recover the costs

60

of providing individual special services, implying that charges in excess of these costs are prohibited.  The Bureau of the Budget confirmed this restrictive construction, stating that 'the *maximum* fee for a special service will be governed by its total cost and not by the value of the service to the recipient.'") (quoting Bureau of the Budget, Circular No. A-25, para. 5.b (Sept. 23, 1959)) (emphasis in original); see also Fed. Power Comm'n, 415 U.S. at 349–50 (adopting the Bureau of the Budget's construction of the IOAA).

The Court of Appeals confronted a similar situation in Wisniewski when it sought to determine whether the Postal Reorganization Act, 39 U.S.C. § 3009 conferred an implied private right of action.  The parties agreed that the language of § 3009(b) "demonstrate[d] Congress's intent to create a personal right for recipients to treat unsolicited merchandise as a gift."  510 F.3d at 302.  But the other two provisions of the statute were worded "as prohibitions on the person regulated rather than entitlements for the person protected."  Id.  With regard to these latter two provisions, the Wisniewski Court noted that they "do not necessarily create 'personal rights'" and offered the following thoughts:

> Even though Sandoval suggests that the distinction between a statute focusing on the person regulated and one focusing on the person protected is still significant, see 532 U.S. at 289, 121 S.Ct. 1511, we would be reluctant to place dispositive weight on this factor.  The apparent "focus" of a statute might have more to do with Congress's

writing style than its intent.  See RICHARD H. FALLON, JR. ET AL.,
HART AND WECHSLER'S FEDERAL COURTS AND THE FEDERAL
SYSTEM 785 (5th ed. 2003) ("Does the appropriateness of a private
right of action depend on whether a statute says 'no person shall be
subjected to discrimination in a federally funded program' rather than
'no federally funded program shall discriminate'?").  In the present
case, for example, § 3009(c) might have appeared to "focus" more on
the individual protected if Congress had written "No recipient shall
be mailed a bill for such merchandise . . .," but the meaning would be
identical.  We do not consider Congress's use of the passive voice a
reliable guide to its intent to create personal rights.

510 F.3d at 302 n.19.

Similarly I do not consider the IOAA's focus on agency conduct and

its use of the passive voice (i.e., "[e]ach charge shall be . . . .") dispositive in

determining whether Congress intended for the IOAA to create a personal right to

be charged only fees that comport with the criteria in subsection (b).  Like the

Wisniewski Court, I need not reach a firm conclusion on this issue for the next

section of this opinion will show that Congress did not intend to create a private

remedy for violations of the IOAA.  Id. at 302 ("Even assuming arguendo that

Congress intended these provisions to create personal rights, the distinction is

largely academic because we can find no legislative intent to create a private

remedy, for the reasons discussed below.").

### iii.  Congress Did Not Intend to Create a Private Remedy for Violations of the IOAA.

The Court of Appeals has summarized its approach to the mass of Supreme Court case law that has addressed the issue of whether Congress intended to create an implied private right of action in a particular statute:

> In the generation since the Supreme Court declared that legislative intent to create an implied private right of action is the sole touchstone of our inquiry, the Court has not provided a test for discerning this intent. Most of its decisions have relied on whatever indicators of legislative intent appear to be useful in the context of a given statute. The Court frequently has examined factors related to the text and structure of the statute in question, including the existence of a comprehensive remedial scheme in the statute and the explicit creation of a private right of action elsewhere in the same statute. The Court has also relied upon various aspects of the statute's legislative history, the "customary legal incidents" that follow directly from a statutory provision, Congress's explicit creation of private rights of action in similar statutes enacted at roughly the same time, and an assortment of other factors.

Wisniewski, 510 F.3d at 303–04 (footnotes omitted). Like the Wisniewski Court, which sought "[t]o provide some boundaries to [its] inquiry into congressional intent," I "will confine [myself] to those purported signals of legislative intent that the parties have raised and that are consistent with current doctrine." Id. at 304.

Although most of the factors listed above do not apply here,[72] the

---

[72] I am not aware of any part of the IOAA's legislative history that sheds light on Congress' intent (or lack thereof) to create a private remedy to enforce the IOAA. The absence of any such legislative history certainly does not detract from the force of the reasoning that arises out of the text and structure of the IOAA. See Sandoval, 532 U.S. at 288 n.7 ("[T]he interpretive inquiry begins with the text and structure of the statute, and ends once it has become clear that Congress did not provide a cause of action.") (internal citation omitted). As for the

IOAA's remedial scheme shows that Congress did not intend to create a private

remedy to enforce the IOAA.[73]  The <u>Thomas</u> Court explained this remedial scheme

clearly when it wrote that:

> The Act is nonfit in other ways.  The Act applies to monies bound for
> the federal treasury.  In its original form, the Act stated that "any
> amount" from fees or charges for government services "shall be
> collected and paid into the Treasury" as miscellaneous receipts.  Pub.
> L. No. 137, tit. V, 65 Stat. 268, 290, formerly codified at 31 U.S.C. §
> 483a, recodified at 31 U.S.C. § 9701.  The 1982 recodification of the
> Act omitted this requirement but only because § 3302(a) made it
> "unnecessary."  31 U.S.C. § 9701, Explanatory Notes.  [31 U.S.C.]
> Section 3302 provides that any official or agent who receives money
> for the government from any source shall keep the money safe, <u>see</u> §
> 3302(a), and deposit the money in the Treasury, <u>see</u> § 3302(b).  The
> monies at issue here – the 70 percent portion of the domain name fees
> – were paid to Network Solutions for its services.  The company is
> under no duty to turn over any portion to the federal government.  To
> the contrary, according to the cooperative agreement and federal law,
> <u>see</u> 58 Fed. Reg. 62,992, 62,995, 62,998 (1993), as amended by 62
> Fed. Reg. 45,934 (1997), the monies belong to Network Solutions.

---

other factors, the Corporate Defendants have not articulated any argument relating to the
"customary legal incidents" (if any) that follow directly from the IOAA, or to Congress' explicit
creation of private rights of action in similar statutes enacted at roughly the same time as the
IOAA.

[73] Defendant Block argues that another factor weighing against Congress' intent to create
a private remedy is the IOAA's location in the United States Code.  <u>See</u> Defendant Block's
Memorandum of Law at 16 ("Section 9701 is located in the 'Miscellaneous' Chapter of the
Money and Finance title of the U.S. Code, and the surrounding code sections are entirely
unrelated to the cost of government services."); <u>see also</u> <u>Thompson v. Thompson</u>, 484 U.S. 174,
183 (1988); <u>Wisniewski</u>, 510 F.3d at 304 n.26 (citing <u>Thompson</u> for the proposition that "the
provision's location in the United States Code" is one of "an assortment of other factors" that the
court may consider).  I agree with Defendant Block but note that this factor is a weaker indicator
of Congress' intent than the IOAA's remedial scheme, which neither includes nor appears to
require an express private remedy.

> Any remaining doubt is laid to rest by considering the penalty for noncompliance with § 3302.  An official or agent who receives money for the government and does not deposit such money promptly in the Treasury may be removed from office.  See id. § 3302(d).  This sanction makes no sense with respect to a private actor like Network Solutions.

Thomas, 176 F.3d at 511.

What the Thomas Court called the IOAA's "nonfit" is another way of saying that the IOAA's remedial scheme evinces an intent not to provide a private remedy for violations.  The IOAA regulates fees collected by government agencies.  If a particular agency charges an excessive fee, an action is presumably available under the APA to obtain a refund.[74]  See Air Transport Ass'n of America v. Civil Aeronautics Bd., 732 F.2d 219, 227–28 (D.C. Cir. 1984); see also Note, 94 Harv. L. Rev., at 455 n.77 ("Although an agency has discretion to determine when and in what amount a fee will be charged, an individual may challenge both determinations as arbitrary and capricious, and therefore invalid, under § 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1976).").  And if an agency employee fails to promptly deposit public money into the Treasury, he or she may removed from office.  See 31 U.S.C. § 3302(d).  I therefore find that Congress did not intend to create a private remedy for

---

[74] This addresses Plaintiffs' concern that "if the fees collected by the defendants are illegal there must be a form to provide a refund."  Plaintiffs' Response to Intuit's Motion, at 17.

65

violations of the IOAA; its remedial scheme appears to be complete without one.

### c. Conclusion

Congress did not provide an express private right of action to enforce the IOAA and it is unclear whether Congress intended for the IOAA to create a personal right for individuals to be charged only fees that comport with the criteria in subsection (b) (i.e., 31 U.S.C. § 9701(b)).  It is clear, however, that Congress did not intend to create a private remedy for violations of the IOAA.  I therefore hold that no express or implied private right of action exists under the IOAA, and I will grant the Corporate Defendants' Rule 12(b)(6) motions to dismiss Count I on this ground.

### C.  Count II – Plaintiffs' Sherman Act Claim

With respect to Count II – i.e., Plaintiffs' claim under Section 1 of the Sherman Act – the Corporate Defendants argue that this claim should be dismissed pursuant to Rule 12(b)(6) for five reasons:  (1) because they are entitled to implied antitrust immunity; (2) because they are shielded from liability under the Noerr-Pennington doctrine; (3) because Plaintiffs lack antitrust standing; (4) because "Plaintiffs have not adequately alleged an agreement to limit free services";[75] and (5) because "Plaintiffs have failed to plead any restraint on trade in a relevant

---

[75] See Defendant FFA's Memorandum of Law, § III.C.

market."[76]  As explained below, I reject arguments (3), (4), and (5), but I agree that Count II should be dismissed on the ground that the Corporate Defendants are entitled to implied antitrust immunity.  As for the Corporate Defendants' assertion of <u>Noerr</u>-<u>Pennington</u> immunity, I will defer ruling upon it until it is raised in a motion for summary judgment because it requires consideration of non-public matters outside the pleadings.  I therefore will dismiss Count II with leave to amend.

### 1.  Plaintiffs Have Established Antitrust Standing and Otherwise Have Satisfied the Pleading Requirements for Their Sherman Act Claim.

### a.  Antitrust Standing

In determining whether a particular plaintiff has standing to sue under the antitrust laws, the Court of Appeals weighs the following factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

---

[76] <u>See</u> Defendant Block's Memorandum of Law, § III.C.3.

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740–41

(3d Cir. 2004).[77]

        Defendant FFA's antitrust standing argument appears to focus

entirely on the second factor – the antitrust injury prong – which is "a necessary

but insufficient condition of antitrust standing."  Barton & Pittino's, Inc. v.

SmithKline Beecham Corp., 118 F.3d 178, 182 (3d Cir. 1997).  Specifically,

Defendant FFA argues that Plaintiffs "have not alleged 'harm' that resulted from

the 2005 Agreement," because they have not alleged why or even whether they

were part of "a group of taxpayers who could not get free filing services through

the Free File Program" after the 2005 Agreement went into effect.  See Defendant

---

[77] Like constitutional standing, antitrust standing is a threshold requirement.  See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998); see also A.D. Bedell Wholesale Co., Inc. v. Phillip Morris Inc., 263 F.3d 239, 249 (3d Cir. 2001) (noting that a court must conduct this threshold inquiry even if it ultimately concludes that one of the antitrust immunity doctrines bars the plaintiff's claim).  However, the two doctrines differ in important respects; in this regard, the Supreme Court has observed that:

> [T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine.  Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535, n.31 (1983).  One important difference between antitrust standing and constitutional standing is that a plaintiff's failure to establish antitrust standing results in dismissal under Rule 12(b)(6), not Rule 12(b)(1).  See NicSand, Inc. v. 3M Co., 507 F.3d 442, 449 (6th Cir. 2007); Glaberson v. Comcast Corp., Civ. A. No. 03-6604, 2006 WL 2559479, at *3 n.2 (E.D. Pa. Aug. 31, 2006).

FFA's Memorandum of Law, at 31.

I find this argument unpersuasive because the First Amended Complaint does in fact allege that Plaintiffs are part of the group of taxpayers whose access to free filing services was cut off by the 2005 Agreement.  Under the 2002 Agreement that created the Free File Program, members of the FFA were permitted to offer free electronic tax preparation and filing services to all taxpayers if they wished.[78]  There was therefore no restriction placed on FFA members' output of free services.  In the 2005 Agreement, however, the FFA agreed that no one of its members would offer free services to more than 50% of all taxpayers and that as a whole the FFA would not make free services available to more than 70% of all taxpayers.[79]  The 2005 Agreement therefore affected all taxpayers interested in obtaining electronic tax preparation and filing services in the United States – which is what Plaintiffs have alleged.  See FAC ¶¶ 67, 68, 71, 72.  Moreover, by alleging that they purchased the electronic tax preparation and filing services of Defendants Block and Intuit, Plaintiffs have made it clear that

---

[78] See FAC, Exhibit A, art. III.B.2 (requiring each FFA member to offer free online federal tax return preparation and filing services to 10% of taxpayers, but not setting an upper limit on the percentage of taxpayers who could be offered free services).

[79] See FAC, Exhibit B, arts. I.A and I.D (providing that "[e]ach Alliance member must provide a minimum of 10% coverage," but adding that "[n]o individual Alliance member offer can cover more than 50 percent of total taxpayers . . ., and this taxpayer population must be within the total aggregate coverage scope of 70%").

they are part of the group of taxpayers whose access to free filing services was cut

off by the 2005 Agreement.  Id. ¶¶ 14, 15.  I therefore reject Defendant FFA's

argument against Plaintiffs' antitrust standing.

       The Corporate Defendants have presented no other arguments on

Plaintiffs' antitrust standing, and, after weighing the relevant factors, I conclude

that Plaintiffs have antitrust standing to bring their claim in Count II.[80]  The

second factor – the antitrust injury prong – is satisfied if Plaintiffs establish "(1)

injury of the type the antitrust laws were intended to prevent and (2) that flows

from that which makes defendants' acts unlawful."  A.D. Bedell Wholesale Co.,

Inc. v. Phillip Morris Inc., 263 F.3d 239, 247 (3d Cir. 2001) (quoting Brunswick

Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977)).  The horizontal output

restriction allegedly brought about by the 2005 Agreement easily satisfies this

requirement.  See Bedell, 263 F.3d at 247–50 (reaching the same conclusion with

regard to the output disincentives in the national tobacco settlement); see also

WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 2:13 (2007) ("Horizontal

agreements restricting competition among firms operating at the same level of the

market structure have long been fundamentally suspect under Section 1 of the

---

[80] Plaintiffs' citation of In re Linerboard Antitrust Litig., 305 F.3d 145, 151 (3d Cir. 2002) is misplaced because the "Bogosian short-cut" applies to the predominance factor in class certification analysis, not to antitrust standing analysis.

Sherman Act, even when involving nonprice facets of competition.").

The other relevant factors also clearly weigh in favor of Plaintiffs' antitrust standing.  With regard to the first factor, Plaintiffs' causation and intent allegations are sufficient because reduced access to free services and the alleged increase in prices for electronic tax preparation and filing services were the predictable and direct result of the 2005 Agreement.  See FAC ¶¶ 75–77.  With regard to the third factor, there is no concern here about the directness of Plaintiffs' alleged injury because Plaintiffs plausibly allege that they and the members of the proposed plaintiff class were direct purchasers of the Corporate Defendants' services.  See FAC ¶ 82.  With regard to the fourth factor, I am not aware of anyone besides Plaintiffs and the members of the proposed plaintiff class who could have been a more direct victim of the Corporate Defendants' alleged anticompetitive conduct.  Finally, with regard to the fifth factor, I do not foresee any potential for duplicative recoveries or damages that are unduly difficult to apportion.  I therefore hold that Plaintiffs have antitrust standing to bring their claim in Count II.  Cf. Glaberson v. Comcast Corp., Civ. A. No. 03-6604, 2006 WL 2559479, at *5–7 (E.D. Pa. Aug. 31, 2006).

### b.  Defendants Block and FFA's Other Two Arguments

Defendant FFA argues that "Plaintiffs have not adequately alleged an agreement to limit free services";[81] Defendant Block argues that Plaintiffs have failed to plead any restraint on trade in a relevant market."[82]  In other words, Defendants FFA and Block believe Plaintiffs' Sherman Act claim should be dismissed because, in their view, Count II – which relates to the anticompetitive impact of the 2005 Agreement – does not adequately allege an impact on the nationwide market for electronic tax preparation and filing services (as opposed to the market for services available through the Free File Program).  Defendants FFA and Block cite no case law to support these arguments, and I find them unpersuasive.  As I noted in the preceding section, the First Amended Complaint adequately alleges that the 2005 Agreement affected all taxpayers interested in obtaining electronic tax preparation and filing services in the United States.  See FAC ¶¶ 67, 68, 71, 72.

## 2.  The Noerr-Pennington Doctrine

The Court of Appeals has summarized as follows the most salient aspects of the Noerr-Pennington doctrine:[83]

---

[81] Defendant FFA's Memorandum of Law, § III.C.

[82] Defendant Block's Memorandum of Law, § III.C.3.

[83] This doctrine takes its name from the two Supreme Court cases that first recognized it: E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and United

Under the <u>Noerr</u>-<u>Pennington</u> doctrine, a party who petitions the government for redress generally is immune from antitrust liability. Petitioning is immune from liability even if there is an improper purpose or motive.  Rooted in the First Amendment and fears about the threat of liability chilling political speech, the doctrine was first recognized in two Supreme Court cases holding federal antitrust laws inapplicable to private parties who attempted to influence government action – even where the petitioning had anticompetitive effects. Under the <u>Noerr</u>-<u>Pennington</u> doctrine, mere attempts to influence the Legislative Branch for the passage of laws or the Executive Branch for their enforcement are given immunity from the Sherman Act and other antitrust laws.  The immunity reaches not only to petitioning the legislative and executive branches of government, but the right to petition extends to all departments of the Government, including the judiciary.

. . . .

Under the <u>Noerr</u>-<u>Pennington</u> doctrine, private parties may be immunized against liability stemming from antitrust injuries flowing from valid petitioning.  This includes two distinct types of actions.  A petitioner may be immune from the antitrust injuries which result from the petitioning itself.  Also, and particularly relevant here, parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning. Therefore, if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.

<u>Bedell</u>, 263 F.3d at 250–51 (internal citations, quotations, and footnotes omitted);

see also <u>Mariana</u>, 338 F.3d at 197–200; <u>Mass. Sch. of Law at Andover, Inc. v. Am.</u>

<u>Bar Assoc.</u>, 107 F.3d 1026, 1037 (3d Cir. 1997).

───────────────────

<u>Mine Workers v. Pennington</u>, 381 U.S. 657 (1965).

The negotiations that preceded the 2005 Agreement between Defendants FFA and the IRS may constitute valid petitioning that ultimately requires me to dismiss Count II under the Noerr-Pennington doctrine.  However, I cannot consider evidence of those negotiations at this time because such evidence is neither mentioned in the pleadings nor a matter of public record.[84]  See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1197 (3d Cir. 1993) (concluding that correspondence between the PBGC and the defendant corporation was not a public record that could be considered in ruling on a motion to dismiss, even if it would have to be disclosed in response to a proper request under the Freedom of Information Act).  I therefore will defer ruling on the Corporate Defendants' assertion of Noerr-Pennington immunity until it is raised in a motion for summary judgment.[85]

---

[84] See, e.g., Defendant Block's Motion to Dismiss, Exhibit H (a letter dated March 30, 2006 from an IRS official to the Executive Director of the FFA "explaining how the level of coverage for services offered through the Free File program was determined by the IRS during the renewal process to extend the partnership agreement between the IRS and the Free File Alliance).  Defendant Block relies heavily on this letter in the section of its brief that discusses Noerr-Pennington immunity.  See Defendant Block's Memorandum of Law, at 26–27.

[85] Defendants Intuit and FFA cite paragraphs 16, 18, and 19 of the First Amended Complaint to support their argument that Plaintiffs have pleaded themselves out of court by alleging facts which establish the applicability of Noerr-Pennington to bar Plaintiffs' Sherman Act claim.  See Defendant Intuit's Memorandum of Law, at 21–22 ("Plaintiffs' Amended Complaint implies that Intuit and other Free File Alliance members agreed to solicit the IRS to limit their provision of free e-filing services, see FAC ¶ 19, and that they furthered their agreement by successfully negotiating with the IRS an agreement to limit the provision of free e-filing services.  See FAC ¶¶ 16, 19."); Defendant FFA's Memorandum of Law, at 23 ("Plaintiffs

### 3.  Implied Antitrust Immunity

Since Plaintiffs have antitrust standing and since I cannot yet rule on the Corporate Defendants' assertion of <u>Noerr</u>-<u>Pennington</u> immunity, I must consider whether the Corporate Defendants are entitled to what they call "implied" antitrust immunity.  As explained below, I hold that they are entitled to such immunity; Plaintiffs' Sherman Act claim in Count II therefore will be dismissed with leave to amend.

#### a.  Implied Antitrust Immunity Doctrine

What the cases often refer to as the "federal instrumentality doctrine" really comprises two related doctrines of antitrust immunity.  The first doctrine is

---

allege that the IRS actively negotiated with the FFA, and that it directly guided, supervised and controlled its own Free File Program.  *See* FAC ¶ 18.").  Despite the use of the word "negotiated" in paragraph 16, I disagree with Defendants Intuit and FFA's interpretation of these paragraphs.  These paragraphs merely allege that Defendant FFA entered into the 2002 and 2005 Agreements with the IRS, <u>see</u> FAC ¶¶ 16, 18, and that "when renewing the 2002 Agreement with the IRS in 2005, the members of the [FFA] illegally agreed *among themselves*" to restrict the availability of free services through the Free File Program.  FAC ¶ 19.  Since these paragraphs say nothing specific about the Corporate Defendants' petitioning/negotiating activity (or the effects thereof), they are not a sufficient basis for dismissing Plaintiffs' Sherman Act claim on the ground of <u>Noerr</u>-<u>Pennington</u> immunity.

Defendants Intuit and FFA also cite paragraphs (e) and (g) of the First Amended Complaint's Prayer for Relief as proof that "Plaintiffs' true dispute is with the effects of government action," thus establishing the applicability of <u>Noerr</u>-<u>Pennington</u> to bar Plaintiffs' Sherman Act claim.  Defendant Intuit's Memorandum of Law, at 24; Defendant FFA's Memorandum of Law, at 23.  Again, I disagree.  These paragraphs are simply requests for injunctive relief against Defendants' alleged violations of the IOAA and the Sherman Act.  They say nothing about the petitioning activity (and the effects thereof) that the Corporate Defendants must prove to prevail against Plaintiffs' Sherman Act claim on the ground of <u>Noerr</u>-<u>Pennington</u> immunity.

status-based; that is, the party in question is absolutely immune from antitrust

liability if it can be considered a "federal instrumentality."  See Sea-Land Serv.,

Inc. v. Alaska Railroad, 659 F.2d 243, 246 (D.C. Cir. 1981) ("[W]e hold that the

United States, its agencies and officials, remain outside the reach of the Sherman

Act.").  This status-based immunity is "founded on the sovereign immunity of the

United States," which is not a "person" subject to suit under the antitrust laws.

Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 581 (2d Cir. 2000)

(citing United States v. Cooper Corp., 312 U.S. 600, 614 (1941)).  Status-based

federal instrumentality immunity clearly applies to federal agencies, but it may

also apply to private entities depending "on the extent to which the federal

government or its agencies directly own and/or exercise plenary control over the

entity in question."  Name.Space, 202 F.3d at 581 (citing Sakamoto v. Duty Free

Shoppers, Ltd., 764 F.2d 1285, 1289 (9th Cir. 1985)).

       The other federal instrumentality immunity doctrine is conduct-based;

that is, the party in question is immune from antitrust liability "where the

complained of acts were specifically directed by the federal government."

Name.Space, 202 F.3d at 583; see also Phonetele, Inc. v. Am. Tel. & Tel. Co., 664

F.2d 716, 733 (9th Cir. 1981) ("[W]here conduct is compelled by the regulatory

agency, not implying antitrust immunity would be unfair to the regulated entity

and would frustrate agency policies.").  This conduct-based immunity focuses on the "nature of the activity challenged, rather than the identity of the defendant," Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 58–59 (1985) (applying the same principle to state action antitrust immunity doctrine), so "the existence of a government contract does not automatically confer a federal agency's absolute antitrust immunity onto a private contractor." Name.Space, 202 F.3d at 582; accord Otter Tail Power Co. v. United States, 410 U.S. 366, 378–79 (1973) ("[G]overnment contracting officers do not have the power to grant immunity from the Sherman Act."); Thomas, 176 F.3d at 509 ("A contractor might be free to perform the contract in any number of ways, only one of which is anticompetitive.").  In determining whether conduct-based federal instrumentality immunity applies to a party, I also must consider whether the conduct compelled by the federal agency is consistent with government policy, Name.Space, 202 F.3d at 583–84, and whether any of the party's other actions make the implication of conduct-based immunity improper.  See Otter Tail, 410 U.S. at 378–79 (declining to grant the antitrust defendant conduct-based immunity based on its contract with a federal agency because the "restrictive provisions operate as a 'hindrance' to the Bureau and were 'agreed to by the Bureau only at [the antitrust defendant's] insistence.'").

### b. Applying Implied Antitrust Immunity Doctrine to This Case

Application of the status-based and conduct-based immunity doctrines to this case leads me to conclude that the Corporate Defendants are entitled to conduct-based immunity, but not status-based immunity. In reaching this conclusion, I rely heavily on the decision of the Court of Appeals for the Second Circuit in <u>Name.Space, Inc. v. Network Solutions, Inc.</u>, 202 F.3d 573 (2d Cir. 2000), so I first will summarize <u>Name.Space</u> and then explain why I find its principles controlling in this case.

Interestingly, <u>Name.Space</u> involved the same cooperative agreement between the National Science Foundation ("NSF") and Network Solutions, Inc. ("NSI") that gave rise to the litigation in <u>Thomas</u>. 202 F.3d at 577–78. Instead of contesting the fees levied by NSI for domain name registration, however, the plaintiff in <u>Name.Space</u> "contest[ed] NSI's control of the master root zone server and file."[86] <u>Id.</u> at 577. Specifically, the <u>Name.Space</u> plaintiff objected to NSI's

---

[86] As someone not intimately familiar with how the internet works, I benefitted greatly from the Court of Appeals' explanation of this and other jargon:

The current [Domain Name System ("DNS")] has a hierarchical tree structure of names. A domain name, such as <www.uscourts.gov>, comprises a series of alphanumeric fields , or "domains," separated by periods or "dots." Within each domain name, the alphanumeric field to the far right is the Top Level Domain ("TLD"), and each prior field to the left of the period preceding the TLD is the Second Level Domain ("SLD"), the Third Level Domain, and so on. Thus, TLDs

refusal to grant its request that certain generic top level domains ("gTLDs") it had

created be added to the master root zone file.[87]  Id. at 579.  The plaintiff therefore

---

are the highest subdivisions of Internet domain names, and SLDs and other lower
level domains identify the host computers and individual websites under each
TLD.  There are currently two different types of TLDs:  seven generic TLDs
("gTLDs"), namely ".com," ".net," ".org," ".edu," ".gov," ".int," and ".mil," and
approximately 240 two-letter country code TLDs ("ccTLDs"), such as ".us,"
".uk," ".jp," and ".kr."

The process of converting domain names into IP numbers [– which identify
computers connected to the internet and allow them to communicate with each
other –] begins with the "root zone file," which is the highest level of the domain
name system and contains the databases enabling an Internet address query to be
routed to its proper destination.  The master root zone server of the DNS contains
the authoritative root zone file, from which the other 12 duplicate root zone
servers download new domain name information on a daily basis.  The root zone
file serves the function of directing an address query to the proper TLD zone file,
which contains information regarding the location of the numerous gTLDs and
ccTLDs.  The TLD zone file in turn directs the address query to SLD zone files,
which contain listings of all SLDs and corresponding IP numbers under the TLD
in question.  The SLD zone files then direct the query to lower level portions of
the DNS, until the address query is fully resolved.

Name.Space, 202 F.3d at 577 (internal citations and footnotes omitted).

[87] The Court of Appeals wrote the following to explain why this request was so important
to the plaintiff's business:

In late 1996, Name.Space's predecessor-in-interest, pgMedia, Inc., began
providing domain name registration services in competition with NSI, and
accepted new registrations under approximately 530 new gTLDs, such as
".forpresident," ".formayor," and ".microsoft.free.zone."  However, domain
names registered under Name.Space's gTLDs are not universally resolvable, that
is, they cannot be converted into the correct IP numbers by most users of the
Internet, because those gTLDs are not listed in the root zone files.  Thus, unless
NSI amends the master root zone file to include Name.Space's new gTLDs, the
domain names registered with Name.Space cannot be located by all Internet users,
as Internet address queries are initially routed to the various root zone servers
containing NSI's master root zone file.

alleged that NSI "ha[d] abused its monopoly power over the domain name registration system to maintain its control of an essential facility, namely the root zone file." Id. at 581.

In concluding that NSI's activities were entitled to implied antitrust immunity, the Name.Space Court first made it clear that the applicable immunity was conduct-based, not status-based:

> We choose not to apply the essentially status-based federal instrumentality doctrine; reliance on such a broad rule of immunity might improperly insulate NSI and other private entities that are or will be involved in administering the DNS from liability for future anticompetitive conduct. Thus, NSI's mere status as a government contractor does not entitle it to implied antitrust immunity for all its conduct.

Id. The Court then explained that NSI was entitled to conduct-based immunity because "the conduct being challenged by Name.Space in this appeal was compelled by the explicit terms of NSI's agreement with a government agency and by the government's policies regarding the proper administration of the DNS."[88, 89]

_____

Id. at 578.

[88] The Court summarized as follows the effect of the relevant terms in the NSF-NSI cooperative agreement:

> As noted above, the Cooperative Agreement requires NSI to provide Internet domain name registration services in accordance with the provisions of RFC 1174. RFC 1591, the successor to RFC 1174, states that:

> > [t]he Internet Assigned Numbers Authority (IANA) is responsible for the overall coordination and management of the Domain Name System

Id. at 582.

Name.Space's reasoning is directly applicable to this case.  Like the

_____

> (DNS), and especially the delegation of portions of the name space called
> top-level domains. . . .  Applications for new top-level domains (for
> example, country code domains) are handled . . . with consultation with
> the IANA.

> The Cooperative Agreement also states that the NSF "has responsibility for
> registration services support, support planning, oversight, monitoring, and
> evaluation," and that it "will make approvals required under the General
> Conditions."  One of these General Conditions, Grant General Condition No. 8,
> requires NSI "to obtain prior written approval from the NSF Grants Officer
> whenever there are significant changes in the project or its direction."  Thus, NSI
> first sought to consult with IANA regarding Name.Space's request that its gTLDs
> be added to the root zone file.  When IANA declined to provide any direction and
> indeed disclaimed any authority with respect to the addition of gTLDs, NSI
> undertook to obtain NSF's approval for the significant project change of accepting
> applications for new gTLDs without the supervision or even the participation of
> IANA.  NSF not only refused to give NSI the written approval required under the
> Cooperative Agreement, but Amendment No. 11 further memorialized and
> reinforced this refusal, stating that NSI "shall request written direction from an
> authorized [Commerce Department] official before making or rejecting any
> modifications, additions or deletions to the root zone file."

> Thus, there was only one course of conduct open to NSI pursuant to the
> Cooperative Agreement:  to refuse to add any new gTLDs to the root zone file,
> which refusal is precisely the basis for Name.Space's antitrust claim.

Id. at 582–83

[89] The Court's discussion of government policy was considerably more straightforward.
In June 1998, the Commerce Department published a final policy statement on the future of the
DNS known as the "White Paper."  Id. at 578.  This document articulated a number of policy
objectives, one of which was that "the stability and future development of the DNS is best served
by not adding any new gTLDs during the transition to ICANN [i.e., the non-profit corporation
created to succeed NSI as the manager of the DNS]."  Id. at 583.  In light of this language, the
Name.Space Court concluded that "the specific conduct undertaken by NSI pursuant both to the
White Paper and to the Cooperative Agreement is a direct result of government policy and is
thereby entitled to implied antitrust immunity."  Id. at 584.

Court of Appeals in <u>Name.Space</u>, I do not believe it is appropriate to grant the Corporate Defendants status-based federal instrumentality immunity on the basis of their agreements with the IRS because that immunity would be unduly broad. However, I find that the Corporate Defendants, like NSI, are entitled to conduct-based immunity since their allegedly anticompetitive conduct is compelled by the terms of the 2005 Agreement and since that conduct appears to be consistent with the IRS's policy regarding electronic tax preparation and filing.

It requires little analysis to see that the 2005 Agreement and its accompanying Memorandum of Understanding ("MOU") require the Corporate Defendants to restrict the availability of free electronic tax preparation and filing services under the Free File Program.  <u>See</u> FAC, Exhibit B (2005 Agreement, Articles I.D and I.E – prohibiting FFA members from offering free services to more than 50% of all taxpayers or to taxpayers whose AGI is above the 70th percentile and declaring that the IRS "will not accept or post any offer by an Alliance member which exceeds this AGI amount"); Defendant Block's Motion to Dismiss, Exhibit D (January 12, 2007 MOU, Article 4.1.3(i) – imposing the same restrictions on the availability of free services; Article 7.1.3 – allowing the IRS to remove an FFA member's listing or to refuse to post a prospective member's listing if the member has failed to comply with any of the Standards of Practice in

Article 4).  The terms of the 2005 Agreement and the MOU are clear – certainly

much clearer than the tangle of provisions the Court of Appeals waded through in

Name.Space.  See Name.Space, 202 F.3d at 582–83.  I therefore conclude that the

explicit terms of the 2005 Agreement and its accompanying MOU require the

Corporate Defendants to engage in what Plaintiffs have alleged is a violation of

the Sherman Act – i.e., restricting the availability of free electronic tax preparation

and filing services under the Free File Program.[90]

I believe the fact that the IRS imposed the above-mentioned

contractual duties on the Corporate Defendants is sufficient to immunize their

conduct in performing those duties from liability under the Sherman Act,

especially when there is so little ambiguity in the contractual language.  However,

the Name.Space Court took the extra step of observing that NSI's conduct also

conformed to the government policy – expressed in the Commerce Department's

White Paper – against adding new gTLDs.  Id. at 583–84.  Here too, the IRS's

decision to limit the availability of free services under the Free File Program was

_____

[90] The Corporate Defendants argue that I may reach this conclusion simply by crediting
Plaintiffs' allegations that the Corporate Defendants acted as the IRS's "agents," FAC ¶ 54, and
that they "agreed to develop and maintain the IRS's electronic tax forms and filing system (IRS
e-file) for the IRS under the IRS's direct guidance, supervision and control."  Id. ¶ 18.  I disagree
for these allegations would be meaningless if they were contradicted by the express terms of the
2005 Agreement or its accompanying MOU.  Here it so happens that these allegations do not
contradict the terms of the Agreement or the MOU.  They therefore neither add to nor detract
from my analysis on this point.

part of its ongoing attempt to achieve the statutory goal of increased e-filing

through cooperation with the private sector.  See FAC, Exhibit A, art. I.3

(declaring that one of the purposes of the Free File Program is to "[s]upport[] the

IRS's statutory goals of increased e-filing, pursuant to the IRS Restructuring and

Reform Act of 1998, which encouraged the IRS to set a goal of having 80% of

Federal tax and information returns filed electronically by the year 2007"); FAC,

Exhibit B ("[T]he Alliance and the IRS, hereby mutually agree to amend and

extend the agreement executed on October 30, 2002, subject to the following

changes and additional conditions."); see also IRS Restructuring and Reform Act

of 1998, Pub. L. No. 105-206, § 2001(a), 112 Stat. 723 (1998).  One certainly can

question whether the restrictive provisions in the 2005 Agreement and its MOU

are the best way for the IRS to promote the goal of increased e-filing, but they are

not inconsistent with that policy.[91]  This factor therefore bolsters my conclusion

that the Corporate Defendants are immune from antitrust liability for the

anticompetitive conduct they were compelled to engage in pursuant to the 2005

Agreement and its MOU.

---

[91] On the one hand, one could argue that unlimited free services would do more to increase e-filing.  On the other hand, one could argue that modest restrictions on free services are necessary because unlimited free services would threaten the financial health of the FFA's members – upon whose continued participation the Free File Program depends.

The last factor I must consider in deciding whether to grant the Corporate Defendants conduct-based immunity is whether any of their other actions make the implication of such immunity improper.  In <u>Otter Tail</u>, the Supreme Court declined to grant the antitrust defendant conduct-based immunity based on its contract with the Bureau of Reclamation because the "restrictive provisions [which authorized and required its anticompetitive conduct] operate[d] as a 'hindrance' to the Bureau and were 'agreed to by the Bureau only at [the antitrust defendant's] insistence.'"  410 U.S. at 378–79.  The <u>Name.Space</u> Court distinguished <u>Otter Tail</u> on the grounds that, unlike that defendant, NSI had not demanded the contract provisions at issue, nor had its anticompetitive conduct pursuant to the Cooperative Agreement advanced its own commercial interests or impeded the interests of the government.  202 F.3d at 582 n.9.

Like the <u>Name.Space</u> Court, I also conclude that the <u>Otter Tail</u> exception to the conduct-based immunity doctrine does not apply in this case. Plaintiffs have not alleged that the IRS agreed to the restrictions on free services only at the Corporate Defendants' insistence nor have Plaintiffs alleged that those restrictions were a "hindrance" to the IRS.  Plaintiffs have alleged, however, that the Corporate Defendants benefitted from the restrictions on free services; that is, after all, the basis for their Sherman Act claim.  <u>See</u> FAC ¶¶ 66–85.  The question

therefore arises whether Plaintiffs can amend their Sherman Act claim in Count II to allege facts that implicate the Otter Tail Court's concerns.[92]

In sum, I hold that the Corporate Defendants are entitled to conduct-based immunity from liability under the Sherman Act for two reasons:  (1) because their allegedly anticompetitive conduct is compelled by the express terms of their 2005 Agreement with the IRS and its accompanying MOU; and (2) because that conduct appears to be consistent with the IRS's policy regarding electronic tax preparation and filing.  However, since Plaintiffs may be able to amend Count II to allege facts that cast doubt on the Corporate Defendants' conduct-based immunity, I will dismiss Count II with leave to amend.

### D.  Plaintiffs' Action Is Not Barred by the APA.

The Corporate Defendants' last argument is that this action is barred by the APA because it is an "untimely attempt to end-run around the APA's rulemaking and judicial review procedures."  Defendant FFA's Memorandum of Law, at 33; see also Defendant Block's Memorandum of Law, at 28–30.  I will

---

[92] Plaintiffs should be mindful that any amended allegations must comply with Twombly's requirements.  See 127 S.Ct. at 1965 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).") (internal citations and footnote omitted); see also Phillips, 515 F.3d at 234 ("[Twombly] does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (internal quotation omitted).

reject this argument because it mischaracterizes Plaintiffs' First Amended

Complaint.  Plaintiffs are not asking me to review the regulatory action that led to

the creation of the Free File Program, nor are they asking me to abolish it.  Rather,

Plaintiffs have asserted a claim for a refund of fees allegedly charged in violation

of the IOAA and related injunctive relief (Count I) and a claim for damages and

injunctive relief to redress the Corporate Defendants' alleged violation of the

Sherman Act (Count II).  I do not view either Count as a request for judicial

review of the Free File Program under the APA, so I will deny the Corporate

Defendants' motions to dismiss the First Amended Complaint on this ground.

### IV. Conclusion

For the foregoing reasons, I will grant the Corporate Defendants'

motions to dismiss.  Count I will be dismissed without leave to amend as to all

Defendants except the Internal Revenue Service, which has not filed a motion to

dismiss.  Count II, on the other hand, will be dismissed with leave to amend within

20 days of the date of my Order.[93]

---

[93] "[I]f a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a
curative amendment, unless an amendment would be inequitable or futile."  Alston v. Parker, 363
F.3d 229, 235 (3d Cir. 2004) (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.
2002)).  I will not give Plaintiffs leave to amend Count I because such an amendment would be
futile.  I have held (1) that the IOAA does not apply to private entities like the Corporate
Defendants, (2) that private entities like the Corporate Defendants may not be sued under the
APA, and (3) that there is no express or implied private right of action under the IOAA.  Further
amendment of Count I could not change any of these holdings.  Count II will be dismissed with

An appropriate Order follows.

---

leave to amend because, as explained previously, it is not clear that further amendment would be inequitable or futile.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STACIE BYERS and DEBORAH A. SELTZER, each individually and on behalf of all others similarly situated, Plaintiffs,**<br><br>**v.**<br><br>**INTUIT, INC. and H&R BLOCK DIGITAL TAX SOLUTIONS, LLC and FREE FILE ALLIANCE, LLC, each individually and on behalf of all others similarly situated, and the INTERNAL REVENUE SERVICE, Defendants.** | **CIVIL ACTION NO. 07-4753** |

## ORDER

**AND NOW,** this 28th day of May, 2008, upon consideration of the motions of Defendants Intuit, Inc., the Free File Alliance, LLC, and H&R Block Digital Tax Solutions, LLC to dismiss Plaintiffs' First Amended Complaint (Documents No. 32, 33, and 34 respectively), Plaintiffs' responses thereto (Documents No. 45 and 46), and Defendants' reply briefs (Documents No. 47, 48, and 49), it is hereby **ORDERED** that said motions are **GRANTED** as follows:

    1. Count I is **DISMISSED** without leave to amend as to all Defendants except the Internal Revenue Service; and

2.  Count II is **DISMISSED** with leave to amend within 20 days of the date of this Order.

**BY THE COURT:**

/s/ Thomas N. O'Neill, Jr.

_____

**THOMAS N. O'NEILL, JR., J.**